606 So.2d 1015 (1992)
Donald Ray ABRAM
v.
STATE of Mississippi.
No. 03-DP-0055.
Supreme Court of Mississippi.
July 29, 1992.
Rehearing Denied August 26, 1992.
*1018 Merrida Coxwell, Stanfield Carmody & Coxwell, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen., elected Supreme Court Justice Jan. 3, 1988, Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the court:

I.
On July 23, 1982, Loretta Carson and Percy Quin were shot and killed during the course of an armed robbery at John's Quick Stop No. 2 located on Highway 35 North in Marion County, Mississippi.
At the November 1982, term of the Marion County Grand Jury, Donald Ray Abram was indicted on a charge of capital murder pursuant to Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1991), i.e., murder committed while engaged in the commission of armed robbery.
Abram was tried for the capital murder of Percy Quin beginning March 27, 1984, following which the jury found Abram guilty of capital murder, and sentenced him to suffer the penalty of death. On April 6, 1984, the circuit court entered a final Order of Conviction and Sentence consistent with the jury's verdict.
In due course, Abram moved for a new trial or judgment notwithstanding the verdict. The trial judge entered an Order April 19, 1984, granting what appears to be a judgment notwithstanding the sentencing verdict. The trial judge held the sentence of death handed down by the jury was unconstitutional under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Based on this view of the unconstitutionality of the death penalty, he sentenced Abram to life without parole pursuant to Miss. Code Ann. § 99-19-107 (Supp. 1991).
Abram appealed and has raised the following issues:
1. The appellant's written confession is involuntary as the result of promises and inducements in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 23 and 26 of the Mississippi Constitution;
2. The appellant's confession is inadmissible as an exploitation of an illegal arrest followed by an illegal detention and custodial interrogation in contravention of appellant's rights under the Fourth and Fourteenth Amendments of the United States Constitution and [corresponding provisions of] the Mississippi Constitution;
3. The trial court erred by refusing to suppress the confession after the state failed to follow the procedure for proving the voluntariness of appellant's confession as set forth in Agee v. State, 185 So.2d 671 (Miss. 1966);
4. The trial court erred by refusing to grant appellant a murder instruction;
5. The trial court erred by refusing to quash the venire panels after the prosecution used its peremptory challenges to exclude all blacks from the jury in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Section 26 of the Mississippi Constitution;
6. The court erred in failing to grant appellant a directed verdict on the charge of capital murder after the state rested; and
*1019 7. The court correctly granted appellant a judgment notwithstanding the verdict, however, the court erred by sentencing appellant pursuant to Miss. Code Ann. § 99-19-107 (Supp. 1990).
The State cross-appealed, and raises the following issues:
1. The trial judge exceeded his authority by staying imposition of the jury's lawful sentence and imposing in its stead a sentence of life imprisonment without parole; and
2. The trial judge improperly interpreted and applied Enmund v. Florida to the facts in the present case.
This case was originally argued to the Court on February 18, 1986. Recognizing the presence of a claim under Batson v. Kentucky, the Court, on April 13, 1988, remanded the case to the Circuit Court of Marion County for the limited purpose of conducting a Batson hearing. Abram v. State, 523 So.2d 1018 (Miss. 1988). By Order dated October 14, 1988, the trial court denied relief on this issue, and the case was eventually returned to this Court on July 7, 1989. The case is now ready for decision on all issues.

II.
On July 23, 1982, Donald Ray Abram and Herman Barnes participated in the armed robbery of John's Quick Stop No. 2 in Marion County, Mississippi. During the course of the robbery, Barnes shot and killed the store clerk, Loretta Carson, and a customer, Percy Quin. See Abram v. State, 523 So.2d 1018 (Miss. 1988).
On the basis of information provided the Sheriff by two confidential informants, Abram and Barnes became prime suspects. Warrants were obtained by Marion County Sheriff Thomas "Tomboy" Forbes on August 12, 1982, for Abram's arrest on two charges of capital murder and one charge of armed robbery. Abram was taken into custody on August 12, and following three days of incarceration and interrogation, Abram gave a statement to authorities confessing his involvement in the tragic events of July 23, 1982.
Prior to trial, Abram moved to suppress all statements given by him. Pursuant to this request, the trial court conducted a hearing, and the following relevant facts were revealed:
On July 9, 1982, Abram was arrested on a charge of uttering forgery. Once in custody, he was given the standard Miranda warning. He was given an initial appearance on July 10, at which time bond was set at $4,000.00. That bond was later reduced to $1,500.00, and Abram was able to secure his release on July 14, 1982. Also at this time, Fred Cooper was appointed to represent Abram, and August 12 was set as the date for the preliminary hearing on this charge.
As previously mentioned, the series of events leading to the capital murder charge took place on July 23, 1982. It was on this day that Abram and Herman Barnes arrived at the Quick Stop on Highway 35 North in Marion County and committed an armed robbery resulting in the deaths of Loretta Carson and Percy Quin. The investigating authorities were unable to obtain any physical evidence whatsoever linking Abram to this crime.
However, two confidential informants, one of whom the Sheriff termed reliable because of his track record, provided information to Sheriff Forbes linking Abram and Barnes to the crime, and identifying Barnes as the trigger man. The informants apparently gathered their information somewhere along the grapevine because they were not eyewitnesses and they had not spoken to Abram or Barnes.
Based on the information supplied confidentially to him, Sheriff Forbes executed criminal affidavits charging Abram with two counts of capital murder and one count of armed robbery. Forbes presented these affidavits to Justice Court Judge John Speights on August 12, 1982, prior to Abram's scheduled appearance for a preliminary hearing on the pre-existing charge of uttering a forgery. Sheriff Forbes testified that arrest warrants issued forthwith.
Justice Court Judge Speights confirmed the swiftness with which the warrants were issued. He testified that Sheriff *1020 Forbes summoned him to his office whereupon the Sheriff presented the three aforementioned affidavits. The affidavits prepared by Sheriff Forbes were standard form and recited language to the effect that Sheriff Forbes believed Donald Ray Abram committed the crimes of armed robbery and capital murder on or about July 23, 1982 at the Quick Stop in Marion County. These affidavits did not reveal the basis of Sheriff Forbes' belief.
Notwithstanding, Speights issued the arrest warrants. Before doing so, however, Speights "wanted to be sure that probable cause existed before [he] issued a warrant." In order to satisfy himself, Speights "read the affidavits back to the sheriff, and... said something to [the] effect [of] `Sheriff these are serious. Are you aware of the whole thing?'" Elaborating on his method, Speights testified as follows:
Well, I asked him  I  I didn't have a question-and-answer session. I've known the sheriff for years, and asked the sheriff something to this effect after I had read them  I read them back to the sheriff, and I said, `Sheriff, this is pretty important stuff here. Are you sure about your investigation?' He says, `Yes.' So I told him to put his hand in the air. I put him under oath, and he signed the affidavits, and then I turned around and signed the warrants.
Speights testified that he asked no questions about the basis for the affidavits. It is not at all clear from the record whether Speights was even aware of the fact that Sheriff Forbes was acting solely on uncorroborated information supplied by two confidential informants. Speights testified that he relied solely on the affidavits themselves and the Sheriff's assurances that probable cause was present. As noted above, the affidavits themselves say nothing about confidential informants. Moreover, the record gives no indication that Sheriff Forbes orally supplied any additional information to Speights at the time the affidavits were presented.
In Speights' words, "I wanted to be sure that the sheriff as the chief law enforcement of the county was aware that the affidavit that I had just read him  that contained enough cause for me to issue a warrant." Once the Sheriff "made those statements under oath," Speights assumed the sheriff had probable cause.
With that part done, and knowing that Abram was to appear that day before Justice Court Judge Speights for a preliminary hearing on the pre-existing charge of uttering a forgery, Sheriff Forbes arranged to take Abram into custody following that hearing.
As scheduled, Abram, who had been out on $1,500.00 bond, appeared for the preliminary hearing before Judge Speights on August 12, 1982, with his court-appointed attorney, Fred Cooper. Presumably upon the advice of counsel, Abram waived preliminary hearing on the forgery charge. At this time, Judge Speights abruptly raised Abram's bail on the uttering charge from $1,500.00 to $10,000.00.
Sheriff Forbes admitted at the suppression hearing that he did discuss with Judge Speights earlier in the day the fact that Abram was to appear for preliminary hearing. And Speights admitted that his decision to increase Abram's bail was motivated in part by his prior knowledge that Abram had become a suspect in the robbery-murder which occurred on July 23rd.
Ostensibly, Speights also raised Abram's bail because of another investigation, "about some checks or something," and he wanted to insure the defendant's appearance for trial. Speights also "had received some information that several people of bad influence  now, there was no names given  was going to skip the county."
After the preliminary hearing concluded, and in the absence of counsel, Abram was taken into custody by the Sheriff and/or his deputy, supposedly to see if Abram could make bail on the forgery charge. In fact, Sheriff Forbes' true intent was to take Abram into custody in order to question him about the robbery-murder which occurred at John's Quick Stop. At the time, Abram was neither charged with, nor arrested for, armed robbery and capital *1021 murder even though the Sheriff had arrest warrants to this effect in his possession.
Although Abram was not informed at this time that he was under arrest for the armed robbery of John's Quick Stop and the capital murder of Percy Quin and Loretta Carson, the Sheriff clearly considered him under arrest. When asked whether he would have released Abram if he made bail on the forgery charge, Sheriff Forbes responded in the negative. Abram was never provided a copy of either the criminal affidavits or arrest warrants because it was the Sheriff's policy to provide these documents only to the defendant's counsel. Conveniently, Abram was not provided access to counsel until after he confessed, and the arrest warrants were not officially served and returned until after he confessed on August 15th.
Abram was immediately interrogated on August 12 in the presence of as many as seven people, according to the testimony of Sheriff Forbes. It appears that the primary interrogators were Sheriff Forbes and Milton Magee, an investigator with the Mississippi Highway Safety Patrol. It is essentially undisputed that Abram was given the standard Miranda warning prior to the initiation of questioning. Apparently there was no expression by Abram that he wanted to consult a lawyer, and no indication that he misunderstood his rights.
As for whether or not Abram executed a written waiver of his rights on August 12, Magee stated that he had no recollection of such, but he did remember that Abram executed one the next day in Jackson before submitting to a polygraph examination. No one else present on August 12 testified whether Abram executed a signed waiver of rights before being interrogated.
Forbes and Magee testified that the initial interrogation lasted approximately 45 minutes to 1 hour, although Abram testified that he was interrogated for most of the afternoon. In any event, Abram completely denied his involvement, as he did persistently until he confessed. Magee testified that during the questioning of Abram, he and Forbes probably accused Abram of lying, and confronted Abram with the fact that he had been fingered by confidential informants. They also probably indicated a stronger interest in Barnes, his accomplice.
Magee also admitted that Abram might have been given the impression that a confession was in his best interest since he was not the trigger man. Sheriff Forbes could neither admit nor deny that Abram was pressured to do right by God, and was encouraged to confess since they already knew that he committed the crimes. Forbes also didn't recall telling Abram that Barnes was in deeper trouble because of his role as trigger man, nor did he recall whether the specter of the death penalty was introduced into the interrogation. Magee likewise had no such recollection, but neither denied the possibility.
Also on the 12th, Magee asked Abram to submit to a polygraph examination. Forbes encouraged Abram by telling him that the results of such an exam would not be admissible as evidence against him. Abram refused.
Abram was placed in isolation for the evening, and questioning resumed on Friday August 13, 1982, again with Sheriff Forbes and Milton Magee. Abram continued to deny any involvement in the crimes. Abram testified that at one point during questioning, Sheriff Forbes became angered and threatened him with a "billy" club. Initially, Forbes stated he could neither admit nor deny this incident, but he later denied making this threat. Magee also flatly denied that this incident ever occurred.
Ultimately, Abram consented to a polygraph test at the request of Magee. Abram claims that he was promised a chance at bond if he submitted and this provoked his consent. Magee denied this allegation. Forbes couldn't recall whether or not he made this offer. At approximately mid-afternoon on that Friday, Abram was transported by Magee and Deputy John Harrison to the headquarters of the Mississippi Highway Safety Patrol in Jackson. Dewey Weems administered the test. It is undisputed that prior to doing so, Abram was properly Mirandized, after *1022 which he executed a written waiver of his rights.
Abram failed this test, and was promptly informed of this fact by Weems. He was accused of being a liar, and encouraged to confess. Abram still denied any involvement.
En route back to Marion County, Harrison pulled the car over on a deserted stretch of Highway 13 between Mendenhall and Columbia so he could relieve himself. Harrison testified he was out of the car only a couple of minutes and did not overhear any conversation between Magee and Abram. Abram stated, however, that Magee suggested he come clean. No response was forthcoming.
After unsuccessful attempts to obtain a confession on Friday, August 13, 1982, Abram was again placed in isolation to await the resumption of questioning the next day. Forbes questioned Abram again on Saturday, August 14, 1982, and he claims to have properly Mirandized Abram. The highlight of this day was the solicited appearance of Rev. B. Alfred Jones, a retired minister and active school teacher whose assistance Sheriff Forbes had requested.[1] According to Jones' undisputed testimony, Sheriff Forbes called him because he felt "Donald would like to talk to a white minister."
Rev. Jones had known Abram as a student of his in the 7th or 8th grade, and had visited in his home on several occasions. (Donald Abram was 21 at the time of his arrest). Abram admittedly trusted Rev. Jones, and was moved by the Reverend's words. Sheriff Forbes obviously knew this because he testified that he solicited the intervention of Rev. Jones on the belief that he would put Abram at ease. Forbes also claimed, however, that he found out only after he called Rev. Jones that the minister had been one of Abram's school teachers and counselors.
With the stage set, Rev. Jones was allowed to visit with Donald Abram, and they conversed for nearly an hour that day. It is worth noting that Sheriff Forbes had earlier refused Abram's mother permission to visit because visitors other than legal counsel were only allowed on Sundays. The minister's testimony reveals a deliberate attempt by Sheriff Forbes to coerce a confession from Abram.
Rev. Jones testified without contradiction that Forbes informed him they had strong reason to believe Abram was involved in the Quick Stop robbery-murder, and that maybe Rev. Jones could convince Abram to cooperate given the seriousness of the charge. Forbes told Rev. Jones that it might be easier on Abram if he cooperated, or that Abram might have a chance for mercy. Although not positive, Rev. Jones thought he and Sheriff Forbes discussed the death penalty as well.
Given the sign, Rev. Jones communicated these ideas to Abram. In addition, Rev. Jones offered Abram his opinion on how the Lord viewed the situation, and what the Bible taught, because he, and the Sheriff he thought, wanted to attend to Abram's spiritual welfare. Unwittingly or not, he assisted the Sheriff in conveying impressions of fear and mercy to Abram. Rev. Jones testified he told Abram not only would he face justice here on earth, but that he would be judged by God as well. He talked with Abram about the potential punishment, including the death penalty, and told Abram it would be best to cooperate because the truth would surface sooner or later. Donald Ray continued to deny the allegations, but did show signs of weakening.
Abram testified that after the visit with Rev. Jones, Sheriff Forbes came in and reiterated the benefits of cooperation as well as the effects of not cooperating, i.e., the gas chamber. Abram also corroborated the testimony of Rev. Jones. Still unwilling to confess, Abram was returned to isolation to await further questioning on Sunday.
On the morning of Sunday, August 15, 1982, J.C. Jackson happened by the jail for whatever reason and wanted to talk to *1023 Donald Abram. Homer Sibley, the radio dispatcher on duty that day, granted Jackson's request. Jackson was a former deputy sheriff, much older than Abram, and had known Abram and his family for a long time.
According to Jackson, he and Abram talked about old times for awhile, and Jackson finally confronted Abram with a statement to the effect that "Son, y'all in a mess," and "You cooperate with the law; they'll cooperate with you." Other than this, Jackson says that he and Abram never discussed the incident under investigation.
Jackson also testified he didn't notice any injuries to Abram although there was scuttlebutt to the effect that Abram had been mistreated. Jackson testified that Abram never admitted anything, and that he never requested a lawyer or other assistance.
Abram's version of what transpired that morning is much different. He testified that Jackson informed him that Abram's life had been threatened, as well the lives of his family. Jackson allegedly told Abram that he might as well cooperate because he would not last long on the outside, and because ten (10) years would be the maximum punishment. Jackson also allegedly told Abram about a prisoner who, a couple of years earlier, had been killed by the authorities, allegedly while trying to escape, hinting to Abram that the same thing could easily happen to him.
Jackson allegedly claimed to know from his own experience what the authorities were capable of doing, and he stressed to Abram the importance of cooperating, both for his own sake and that of his family. According to Abram, this got him to thinking that he would "rather go down, you know, than anything happen to my mother or little sister and brothers, you know."
Before Jackson departed, John Harrison, a deputy sheriff, arrived for work. He too knew Donald Abram and wanted to say hello. As he did, Jackson confronted him and said that Abram wanted to talk. Harrison entered the room with Abram, and Abram allegedly expressed a desire to clear his conscience. Harrison promptly Mirandized Abram, and proceeded to take down his statement. Abram was too nervous and shaky after his visit with Jackson to write himself. Harrison assured Abram that cooperating was best, and that he would do the same thing were he in Abram's shoes.
Prior to giving this statement, Harrison says Abram executed a written waiver of his rights, but Abram testified that he didn't recall executing a written waiver until after the confession was complete and he was placed before Judge Speights for an initial appearance. Abram claims that the statement itself was the only thing he signed at that time. After reading the statement as transcribed by Harrison, Abram apparently gave his approval, and according to Harrison, Abram never requested a lawyer or other assistance. Abram testified, though, that he did request counsel before giving the statement.
Harrison called in Homer Sibley to witness the signing of the statement by Abram, although Sibley did not actually witness the confession. Sibley stated that Abram appeared coherent and collected at this time. The statement was given at 1:10 p.m. according to official records.
With the statement in hand, a call was placed to Sheriff Forbes, who proceeded to his office. Around this same time, Judge Speights was summoned to the Sheriff's office for the purpose of providing Abram, finally, with an initial appearance.
Upon arrival, Speights proceeded to read Abram his rights, and appoint Fred Cooper as his attorney. If you will recall, Cooper was at that time acting as Abram's lawyer on the forgery charge. Forbes testified he was not present at the initial appearance. According to Abram, he was allowed to make his first phone call after this initial appearance. He also stated that, despite the appointment on Sunday August 15, Abram had no contact with Cooper until at least the Wednesday following.
Sheriff Forbes was questioned at length as to why Abram was held for three days of questioning without being given access to counsel or an initial appearance. After *1024 all, Abram was represented by Fred Cooper on another charge, and Judge Speights testified that he was in Marion County and accessible from August 12, 1982 to August 15, 1982.
As to the issue of denying Abram access to Fred Cooper, the lawyer present and representing Abram on August 12th at the preliminary hearing for uttering a forgery, Sheriff Forbes testified that he didn't know that Cooper had been appointed to represent Abram on the forgery charge. And even though Sheriff Forbes attended the preliminary hearing on August 12, he failed to recall whether Cooper was present with Abram that day. Carroll Bryant, a Columbia policeman, testified unequivocally, however, that Cooper was present and representing Abram at the preliminary hearing on August 12, 1982.
Sheriff Forbes was frank about why Abram was not given an initial appearance any sooner. Given the complete absence of any physical evidence linking Abram to the crime, Sheriff Forbes considered it "important" to get a statement from Abram. This was his object from the beginning. When asked whether it was important to bring Abram back before Judge Speights on August 12, Sheriff Forbes stated it was "not that important."
When asked whether it was important to bring Abram back before Judge Speights on Friday, August 13, Forbes again stated that it wasn't an important priority. After all, they still had no physical evidence against Abram, and they had no confession. The same held true for Saturday and Sunday, until after they obtained the confession. Prior to obtaining Abram's confession, no attempt was made to schedule an initial appearance.
Abram himself corroborated these events to a large extent. He testified that, other than the "billy" club incident, he was never threatened or mistreated. He was understandably nervous and scared, however, and the words of Rev. Jones and J.C. Jackson, coupled with all the surrounding circumstances, finally caused him to yield to the pressure and confess.
Although there apparently were no concrete promises, Abram testified that he was given several direct indications during the three days of interrogation that Herman Barnes was most wanted, and that cooperation on his part would result in leniency. And while most witnesses testified that Abram never requested a lawyer, or even use of the telephone, Abram testified that he requested use of the phone on Friday, August 13, and again on Saturday and Sunday, but was not allowed to make any calls until after he gave the statement.
Be that as it may, on March 27, 1984, the trial judge denied Abram's motion to suppress the statement. The statement was ultimately accepted into evidence at trial, and that statement reads as follows:
Herman Barnes and myself were riding around. Herman said he needed some money I told him I needed some too. He said I know where we can get some at. I said let's go and he said ok. So we went by his house. He got a shot gun and some shells. Then said we only needed this for security. We started riding up toward John's Quick Stop on HWY 35N. We pulled up to the store where the girl in the store could not see it. Herman went in the store with the shotgun then call me into the store. Then he said get the money He opened the cash register I put the money in a bag. I went and got in the car. As soon as I got in the car a man drove up in a beige truck I was sitting in the car waiting for Herman and I heard a shot Then about that time the man in the beige truck went into the store. Herman had not come out yet. Then I heard another shot Then Herman came running out of the store. And got into the car and we left. I ask him did you shoot those people He said no I shot the man in the leg. I ask him what about the first shot. He said the girl started trying to attack him trying to grab the gun. And the gun went off. About 2 hrs later I heard on the news on the radio that 2 people had been killed at John's Quick Stop. That night I saw Herman. I asked you killed those people and he said no I told him we didn't go up there to *1025 kill anyone. Then he said I couldn't help it man. I tripped out and told him he shouldn't have done it. We got about $612.00 in the robbery. When I told him we didn't go up there to kill anyone he just laughed. [sic].
 Statement taken by
 /s/ John A. Harrison SO-3
 Donald Abram
 /s/ John A. Harrison SO-3
 Homer Sibley
III.
THE APPELLANT'S WRITTEN CONFESSION WAS INVOLUNTARY AS THE RESULT OF PROMISES AND INDUCEMENTS IN VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 23 AND 26 OF THE MISSISSIPPI CONSTITUTION.
THE APPELLANT'S CONFESSION IS INADMISSIBLE AS AN EXPLOITATION OF AN ILLEGAL ARREST FOLLOWED BY AN ILLEGAL DETENTION AND CUSTODIAL INTERROGATION IN CONTRAVENTION OF APPELLANT'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND [CORRESPONDING PROVISIONS OF THE] MISSISSIPPI CONSTITUTION.
THE TRIAL COURT ERRED BY REFUSING TO SUPPRESS THE CONFESSION AFTER THE STATE FAILED TO FOLLOW THE PROCEDURE FOR PROVING THE VOLUNTARINESS OF APPELLANT'S CONFESSION AS SET FORTH IN AGEE V. STATE, 185 So.2d 671 (Miss. 1966).
Abram is arguing on the whole that the circuit court should have found his confession inadmissible, and therefore, suppressible. The reasons advanced by Abram run the gamut from improper inducements and promises to violation of his right to counsel to fruit of the poisonous tree (i.e. an illegal arrest) to violation of the Agee rule.

A. Was the Confession a Product of an Illegal Arrest[2]
ROY NOBLE LEE, Chief Justice, for the Court:
Abram argues here that his confession is inadmissible because it is the product of an illegal arrest. The arrest is illegal according to Abram because of the complete lack of probable cause to issue a warrant, and because Judge Speights did not act as a neutral and detached magistrate when issuing the arrest warrant.
The State counters with the argument that Sheriff Forbes had probable cause to arrest Abram without a warrant so that defects, if any, in the procurement and issuance of the warrant are of no consequence. The State further contends that Judge Speights acted neutrally and impartially, and in any event, there is no basis for finding that the confession resulted from the arrest, if illegal.

1. Probable Cause

The key, initial question indeed is whether in fact Sheriff Forbes had probable cause to arrest Abram without a warrant on August 12, 1982. If Sheriff Forbes lacked probable cause, then the arrest is illegal ab initio, in which case we must proceed further to determine if the confession subsequently given is fruit of the poisonous tree.
Conversely, if Sheriff Forbes did have probable cause, then the arrest is legal notwithstanding that the warrants may later prove to be invalid. Lanier v. State, 450 So.2d 69, 73 (Miss. 1984). The validity of the warrants is a moot point in either case since Abram was not technically arrested by warrant until Sunday, August 15, three days after he was functionally arrested without a warrant.
In Mississippi the test is the same: In order to make a felony arrest, either with or without a warrant, the officer must *1026 have probable cause to believe a felony has been committed, and probable cause to believe the suspect to be arrested committed the felony. Floyd v. State, 500 So.2d 989, 991 (Miss. 1986), cert. denied 484 U.S. 816, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987); Swanier v. State, 473 So.2d 180, 186 (Miss. 1985); Miss. Code Ann. § 99-3-7 (Supp. 1991); Unif.Crim.R.Cir.Ct.P. 1.02.[3]
The first part of the test is clearly met; Sheriff Forbes knew a felony had been committed. But did he, at the time of the arrest, have probable cause to believe Abram committed that felony? Lanier, 450 So.2d at 73. Was the uncorroborated word of two confidential informants sufficient to establish probable cause to believe Abram had committed the felony?
In Swanier, the Court affirmed that probable cause inquiries are case specific and based on the totality of the circumstances.
The existence of "probable cause" or "reasonable grounds" justifying an arrest without a warrant is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. The determination depends upon the particular evidence and circumstances of the individual case. The facts necessary to uphold an arrest without a warrant must be sufficiently strong to support the issuance of a warrant for arrest.
473 So.2d at 186, quoting Smith v. State, 386 So.2d 1117, 1119 (Miss. 1980); see also, Illinois v. Gates, 462 U.S. 213, 230-32, 103 S.Ct. 2317, 2328-29, 76 L.Ed.2d 527, 543-44 (1983).
The basis for Sheriff Forbes' request for arrest warrants for Donald Abram (and consequently the basis for any probable cause) is found in the following excerpts from his testimony at the suppression hearing:
Q. What was the basis of  of this request?
A. Information that I received from an informant.
Q. That the defendant was involved in 
A. Capital murder/armed robbery.
Q. Was this informant a reliable person?
A. Yeah.
Q. Did you get this information from more than one informant?
A. Yeah.
Q. And did you get it from on more than one occasion?
A. It was several occasions.
Q. Okay. Other than that information, what other probable cause did you have for requesting this warrant?
A. Really, none.
* * * * * *
Q. Okay. So  so basically, Sheriff, you had investigated an incident, and the probable cause that you had for the warrant on this defendant was related to information by informant; is that correct?
A. That's correct.
* * * * * *
Q. Okay. Up to that point [the point of arrest], your evidence consisted of hearsay statements from one or more confidential informants, correct?
A. Well, it came from confidential informants. I don't know if you call it hearsay or not. It was true, anyway.
Q. Well, you've testified in a prior hearing that it was hearsay information from a confidential informant; haven't you? Are you saying now it wasn't hearsay?
A. Well, the fellow that told me, he tells the truth.
Q. Well, that's your estimate of it.
A. He hadn't never been wrong before when I got information.
Q. Did he tell you he was present on Highway 35 
A. Nope.

*1027 Q.  when a crime occurred?
A. No.
Q. Did he tell you he personally talked to Donald Ray Abram?
A. No.
Q. Did he tell you who he talked to that indicated that they talked to Herman Barnes or Donald Ray Abram?
A. No.
* * * * * *
Q. How many confidential informants did you have?
A. Well, there were at least two.
Q. Okay. Two? Were these the two individuals who had overheard some people at a party say  overheard some people at a party say they heard Herman Barnes say he had blown some honkies' heads away?
A. Well, I'm not going to answer the question. I figure that's like playing charades. You can keep on, and after a while, you can figure out who it was.
Q. I don't care who it was.
A. Well, I do because I don't want them to get in trouble.
[At this point, the State objected for fear the identity of the informers would be revealed. The court added that the question narrowed it down to a party, and any further details might narrow the inquiry to a particular party and particular individuals present there. Defense counsel then chose another approach.]
Q. Sheriff, would it be true to say that you don't know how your confidential informant got his information?
A. No.
Q. That's correct.
A. That's correct.
Q. Okay, and your informant didn't tell you how he came by his information?
A. No.
Q. He just told you he had some information, and since you knew him, you knew him to be reliable, and accepted that information?
A. That's correct.
Q. Okay. He didn't go into any of the facts and details?
A. I didn't ask.
Q. Okay, and it was based on that information that you filled out Defense Exhibit 3, page 1, Defense Exhibit 2, page 2, and Defense Exhibit 1, page 1, which are all affidavits? It was based on that, that you filled out the affidavits and presented it to Judge Speights, correct?
A. Correct.
* * * * * *
THE COURT:
All right. Now, let me ask you, and I'm  I'm being very careful how I ask these questions, especially about this subject, and think about your answer, also. I'm going to ask you about the informants, but I want you to be sure that whatever your answer is, is not designed to reveal those informants. So just kind of tell me what you feel like you can tell me about them without revealing them, but you say there was more than one?
THE WITNESS:
Yes, sir.
THE COURT:
Did those informants give you  were there more than two?
THE WITNESS:
What's that?
THE COURT:
Were there more than two?
THE WITNESS:
No.
THE COURT:
Did they give you any  any details about the incident to the point of  they did name these two individuals?
THE WITNESS:
Yes, sir.
THE COURT:
Did they give you any details as to maybe which one did the shooting and didn't?
THE WITNESS:
Yes, sir.
THE COURT:
They distinguished between the two?
THE WITNESS:

*1028 Said Herman Barnes was the one that did the shooting.
THE COURT:
And you say that they didn't identify anyone else other than these two?
THE WITNESS:
No.
THE COURT:
You say you have used these informants in the past?
THE WITNESS:
One of them I had.
THE COURT:
One of them you have?
THE WITNESS:
Yeah.
THE COURT:
Have you known these informants for sometime, quite sometime, several years?
THE WITNESS:
Yeah.
THE COURT:
You know their general reputation in the community 
THE WITNESS:
Yeah.
THE COURT:
 for truth and veracity and their character for truth and veracity?
THE WITNESS:
Yes.
THE COURT:
And you find that they are reliable?
THE WITNESS:
Yes, sir.
THE COURT:
And this is why  when you started your investigation as to these two defendants, 
THE WITNESS:
Yes, sir.
THE COURT:
 after you received that information?
THE WITNESS:
Yes, sir.
THE COURT:
Do you know when you received that information? Do you recall in this time sequence when you received it?
THE WITNESS:
It was several different times. The first incident was on  I met with them Tuesday night after the incident happened on I believe it was Friday, the 23rd, wasn't it, of August? I mean, July?
THE COURT:
We have the date.
* * * * * *
THE COURT:
Did you obtain some additional information after that Tuesday?
THE WITNESS:
Yes, sir.
THE COURT:
From these informants?
THE WITNESS:
Yes, sir.
As Forbes' testimony indicates, he had information from two informants implicating Barnes and Abram. One informant he knew, from past experience, to be very reliable. They also accurately pegged Barnes as the trigger man, a fact suggesting some basis of knowledge and further reliability.
Viewing this information "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," Gates, 462 U.S. at 232, 103 S.Ct. at 2329, 76 L.Ed.2d at 544, we believe that Sheriff Forbes possessed the requisite probable cause to arrest and detain Abram without a warrant. To hold otherwise would ignore "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Swanier, 473 So.2d at 186. A more restricted view would leave "virtually no place for anonymous citizen informants." Illinois v. Gates, 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.
Having concluded the arrest of Donald Abram was based on sufficient probable cause, we need not address his remaining claims regarding the actions of the issuing magistrate, or whether the confession is inadmissible as fruit of the poisonous tree.
*1029 SULLIVAN, Justice, for the court:

B. Failure to Provide Prompt Initial Appearance?
Abram also bases his argument that the confession is inadmissible on the failure of the authorities to provide him with an initial appearance within a reasonable time. As mentioned, he was functionally arrested without a warrant and questioned beginning in the early afternoon of Thursday, August 12, 1982. Although a judge was available at all times, Abram was not given his initial appearance until early Sunday afternoon, August 15, 1982, immediately after he confessed.
Unif.Crim.R.Cir.Ct.Prac. 1.04 requires that every arrested person "be taken before a judicial officer without unnecessary delay." See also, Miss. Code Ann. § 99-3-17 (Supp. 1991); Unif.Crim.R.Cir.Ct.Prac. 1.02 (upon completion of an arrest without a warrant, the person arrested should be taken forthwith before a magistrate) (emphasis added). The importance of this first appearance is that the accused is advised of his right to remain silent, his right to appointment of counsel, his right to communicate with counsel and family, his right to preliminary hearing, and the conditions under which he may obtain release, if at all. Unif.Crim.R.Cir.Ct.Prac. 1.04.
In Nicholson v. State, 523 So.2d 68 (Miss. 1988) (Robertson, J. concurring), four justices joined the concurring opinion of Justice Robertson to give meaning and effect to the phrase "without unnecessary delay." See also Coleman v. State, 592 So.2d 517, 520 (Miss. 1991). In Nicholson, the defendant had been taken into custody on the evening of September 3, 1985, though not officially arrested. He remained in police custody, not free to leave, for some 40 hours prior to the voice line-up which was conducted sometime on September 5, 1985. At no time during this period of restraint was Nicholson given an initial appearance and access to counsel.
Because the "major purpose" of the initial appearance "is to secure to the accused prompt ... advice of his right to counsel by a judicial officer ... who [presumably] has no professional duty nor personal inclination to try to exact a waiver of that right," it is imperative that the initial appearance be given "without unnecessary delay" as the rule commands. Id. at 77. "Without unnecessary delay" means as soon as "custody, booking, administrative and security needs have been met." Id. at 76.
Once these needs have been met, "there is but one possible excuse for delay: lack of access to a judge." Id. In the present case, there is absolutely no disputing the availability of Judge Speights from the time Abram was taken into custody, thus belying any excuse for not providing Abram with an initial appearance sooner. There was an obvious and deliberate attempt by the authorities in charge to manipulate the system and deny Abram its benefits until a confession was obtained.
The failure to provide Abram with an initial appearance sooner had devastating consequences for the defense, clearly derogating from his right to a fair trial. Common sense suggests that law enforcement authorities would never have obtained an uncounseled confession from Abram had he been given an initial appearance, and consequently, access to counsel, without unnecessary delay. See cf., Nicholson, 523 So.2d at 77. We hold the failure to provide the initial appearance reversible since, as a consequence, Abram gave a confession in the absence of, and in violation of, his right to counsel. Such an error could hardly be deemed harmless since the conviction of Abram for capital murder was based entirely on his confession.

C. The Agee Rule
Another of Abram's attacks on the admissibility of his confession is based on Agee v. State, 185 So.2d 671 (Miss. 1966). Agee sets forth a now familiar rule for proving the voluntariness of a confession. According to Agee:
The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge *1030 of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. Lee v. State, 236 Miss. 716, 112 So.2d 254 (1959). When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. Lee v. State, supra, is also authority for the proposition that when, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness. See also Holmes v. State, 211 Miss. 436, 51 So.2d 755 (1951).
185 So.2d at 673.
Abram's complaint is directed at the State's failure to offer David DeOrnellas, Jimmy Bracey or the polygraph operator as witnesses at the suppression hearing, and the State's failure to recall Sheriff Forbes, Milton Magee, Carroll Bryant, Judge Speights or John Harrison to specifically rebut Abram's claim that threats and promises were made to him during the interrogation.
As argued by the State, their failure to recall Sheriff Forbes et al. does not run afoul of the Agee rule. The testimony of these witnesses on direct and cross-examination generally denying any wrong-doing, when coupled with Abram's testimony, provided a sufficient evidentiary foundation on which the court could rule. See Thompson v. State, 375 So.2d 233, 234 (Miss. 1979); White v. State, 374 So.2d 843 (Miss. 1979). It was not imperative that these witnesses be recalled merely to reiterate their earlier testimony.
Moreover, regarding Bracey, DeOrnellas, Sibley and Bryant, Abram does not claim that these persons made any threats or offers of reward which induced the confession. Only those persons who are claimed to have induced a confession through some means of coercion are required to be offered by the State under Agee. Reid v. State, 266 So.2d 21, 26 (Miss. 1972). It is highly questionable whether Bracey or DeOrnellas even participated in the interrogation of Abram.
This leaves us with the State's failure to offer Dewey Weems, the polygraph operator who Abram claims made a statement after the exam to the effect that ten years would likely be the maximum punishment. Consistent with Agee, the State offered an excuse why Weems was not called. They defended Weems' absence on the ground that they had no prior knowledge of the allegation by Abram, and therefore, they should not be expected to produce a witness whose potential relevance was not discovered until Abram testified. The District Attorney did, however, offer to subpoena Weems if the court so required. Furthermore, the trial judge observed that Abram never claimed a causal connection between Weems' limited participation and the confession.
We are unable to conclude that any significant Agee violation occurred.
In closing, the State "beseeches" this Court "to consider effecting substantial modification or total abolition of the Agee procedure" because it "is a highly unworkable tool and in practical application amounts to an almost per se reversible error regardless of effect on the substance of the proceeding." Even were we otherwise inclined, we consider this case a wholly inappropriate vehicle for effecting any such wholesale changes, and therefore, decline the invitation extended by the State.

D. Inducements and Promises?
Here, Abram attacks the voluntariness of his confession. He invokes the general rule that a confession, to be admissible, must have been given voluntarily, and not as the proximate result of any promises, threats or other inducements. Layne v. State, 542 So.2d 237, 240 (Miss. *1031 1989); Chisolm v. State, 529 So.2d 630, 634 (Miss. 1988). Given this challenge, Abram secured a due process entitlement to a reliable determination that his confession was in fact voluntarily given. Powell v. State, 540 So.2d 13, 16 (Miss. 1989); Jackson v. Denno, 378 U.S. 368, 377, 84 S.Ct. 1774, 1781, 12 L.Ed.2d 908, 915 (1964). The State has the burden of proving the voluntariness (and consequent admissibility) of the confession beyond a reasonable doubt.
This point generally presents a fact question which is to be resolved by the trial judge according to the correct legal standards. In making this determination, the trial judge must absolutely resist any inclination to consider whether the confession is truthful or authentic; the focus must be limited to the voluntariness of the confession. Powell, 540 So.2d at 15. Once the trial judge has determined the confession to be voluntary, this court will only reverse if convinced that such a finding is manifestly wrong and/or against the overwhelming weight of the evidence, except that our scope of review is less constrained where detailed and specific findings by the trial court are lacking on the critical issue(s). McCarty v. State, 554 So.2d 909, 912 (Miss. 1989); Chisolm, 529 So.2d at 634.
As previously shown, the record of the suppression hearing presents conflicting testimony on several fronts. There are, however, parts of the testimony of Sheriff Forbes, Magee, Jackson, Jones and Harrison that bear close scrutiny. For instance, Magee openly admitted that Abram might have been given the impression that it was his co-defendant Barnes who faced the most trouble, and that his own cooperation would work to his advantage.
Sheriff Forbes' recollection, though lacking on critical points, was nonetheless such that he could not deny that Abram was encouraged to do right by God, that he was told Barnes was most wanted, and/or that Abram was confronted with the possibility of mercy or the death penalty.
Rev. Jones, who unwittingly or not acted as an agent and a conduit for Sheriff Forbes, offered undisputed testimony that he communicated to Abram the fact that his cooperation might work to his advantage. They also talked about the death penalty, and Rev. Jones communicated to Abram, perhaps sincerely and at his own behest, the religious consequences of his actions.
J.C. Jackson undeniably informed Abram on Sunday morning that the law would cooperate with Abram if Abram cooperated with the law. Of course, Jackson maintained that he visited Abram of his own accord, and was not solicited by anyone connected with the investigation. It is clear, however, that Jackson could not have seen Abram at all, regardless of how he came to be at the jail on Sunday, without the permission of law enforcement authorities. Other than this, the remainder of Jackson's communications with Abram are disputed.
Finally, Deputy Harrison testified unequivocally that he tried to put Abram at ease over the confession by putting himself in Abram's shoes, and reassuring Abram "it would look better" if he cooperated.
The trial judge ruled very precisely that the confession was admissible "because of the educational background of the defendant." Abram was 21 at the time and had little more than a year of college experience to his credit. This limited finding by the circuit court may not be reversed unless it appears manifestly wrong, although our scope of review regarding the overall admissibility of the confession is somewhat less constrained given the absence of any specific and detailed findings on this critical issue. McCarty v. State, 554 So.2d 909, 912 (Miss. 1989).
We have repeatedly condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit. Dunn v. State, 547 So.2d 42 (Miss. 1989); Layne v. State, 542 So.2d at 240; Agee v. State, 185 So.2d 671, 674 (Miss. 1966).
In Agee, authorities called J.H. Harvey, a professor who had taught the defendant in school, to the courthouse. Harvey testified *1032 that he didn't threaten the defendant, but he most assuredly told him "to tell the truth" because "it would be lighter on him if he'd tell the truth." 185 So.2d at 674. The Court held this single instance of private communication between Harvey and the defendant was enough to render the confession inadmissible.
A confession made after the accused has been offered some hope of reward if he will confess or tell the truth cannot be said to be voluntary. This Court has long adhered to the rule that when the offer of reward or hope of leniency is made by a private individual the same rule applies. In Clash v. State, 146 Miss. 811, 112 So. 370 (1927) a confession was held inadmissible when it was signed after a private individual had told him that, "* * `If he would tell us about the money, and return it, we would let him out of jail on bond.'" In Johnson v. State, 89 Miss. 773, 42 So. 606 (1906), private citizens told the accused that, "* * * it would be better for him to confess, as it would go lighter with him if he told the truth." The confession that followed these statements by private citizens was held inadmissible.
185 So.2d at 674.
Contrast the facts of Agee with the undisputed facts of this case. Rev. Jones, a former teacher and retired minister, called in by the Sheriff to meet privately with Abram, and Abram only, communicates to Abram, at Sheriff Forbes' direction, the notion that there might be a chance for mercy if he volunteered to cooperate. And though the Reverend couldn't be sure that Sheriff Forbes mentioned the death penalty, he and Abram did discuss the death penalty. The following exchange between defense counsel and the minister is telling:
Q. What, if anything, did the sheriff say concerning whether it would be better for Donald for him to talk to the sheriff?
A. All right. As best as I can remember, it's something like this, that if he was involved or if he knew who was involved, then he should be sharing the names with the sheriff that the right people might be charged and that if he was not involved he wouldn't be.
Q. What, if anything, did the sheriff say if Donald was involved? Did he indicate whether it might go better for Donald if he cooperated?
A. The indications were that if he volunteered, if he was involved and he volunteered to cooperate, that whoever might be in charge of the court, the jury or what-not, might be more lenient than if he blatantly refused and then was proven guilty. It might go real hard for him.
Q. Did you get the indication from Sheriff Forbes that you were to communicate this to Donald?
A. Well, I didn't glean that that was exactly what he wanted me to do. My indication  my gleaning from our conversation was that we were interested in the boy's welfare and not so much as to find some way of trapping him or getting him to admit guilty or whatever part, but rather he was interested in the boy finding help.
Q. What, if anything, did the sheriff tell you about whether Donald might avoid the death penalty or receive a lesser sentence if he cooperated?
A. Now, I cannot state that emphatically, but the indication was that if he  if he was involved, he needed to state what his involvement was and that if he did this, then there might be a chance for mercy, but if he did not, then it needed to be known and who was guilty.
Q. Okay, and did you communicate this to Mr. Abram?
A. Yes, I did. I would like to clarify that, now. My concern was for the  was for the student's spiritual welfare, 
Q. Right.
A.  and I think that he will tell you I spoke to him about the seriousness of doing such a thing as this if he did do it or had any part in it and what the Lord felt about it and what the Bible had to say about these matters, and not only would he face consequences here, but there was God that he would have to meet in judgment and face the consequences *1033 there and that if I could help him spiritually to find understanding and relationship with the Lord and if he was guilty to any degree, if I could help him, I'd help him find forgiveness from the Lord, anything to strengthen his spiritual life.
Q. And it's true that the sheriff indicated to you that if Donald cooperated, he could possibly avoid the death penalty or get a lighter sentence?
A. I'm not sure about that, now. I'm not positive about that. I think we had talked about those things happening in other cases where someone cooperated, that they did and would avoid a death penalty, but I'm not sure what we said about that, now.
Q. Well, do you remember talking with Donald about a long term of imprisonment?
A. Yes, I did.
Q. And do you remember talking with him about the death penalty?
A. Yes, I did.
Q. Did you know that this was a death-penalty crime when you came up to the jail?
A. Yes, if it was the kind of crime that I heard that it was, then I knew that we had a statute that perhaps could lead to the death penalty for that.
Q. And you indicated to Donald that this was a death-penalty crime?
A. Yes.
Q. Okay.
A. If I remember correctly, I did.
Q. Okay, and was there anything else the sheriff told you on August 12, 1982 (sic), to communicate to Donald?
A. I honestly can't remember anything else. I really can't.
Q. And did you communicate to Donald that it might be to his benefit to cooperate?
A. I did.
Q. And is there any question about whether you communicated that to him or not?
A. I wouldn't think so because in our conversation he denied knowing anything about it, being there, being any part of it, and when I insisted that he needed to tell the truth, that eventually one way or the other the truth would be known, then as I was getting ready to leave, he indicated that he might have something he would share with the sheriff ...
Regardless of what Reverend Jones' subjective impressions or intentions were, the plain fact is that Abram was given hope of leniency, and was confronted with the legal and religious consequences of his refusal to cooperate by someone acting at the request of the Sheriff. The Sheriff was available at the suppression hearing but was not recalled to deny these statements. The concluding passage, if believed, also indicates that the Reverend's words were at least a proximate contributing cause of his confession the next day.
Factor in the undisputed testimony of Deputy Harrison that he told Abram at the time the confession was given that, in his view, it would look better if he confessed. Harrison did testify that this statement was made after Abram agreed to confess, but it appears to have been made before Abram did actually confess. Finally, there is Milton Magee's own admission that Abram may have been given the impression by he and Sheriff Forbes that cooperation could be of some benefit.
In Miller v. State, 243 So.2d 558 (Miss. 1971), a confession was held inadmissible where the defendant was induced by a statement from the sheriff to the effect that he would be better off by telling the truth. 243 So.2d at 559; see also, Robinson v. State, 247 Miss. 609, 613, 157 So.2d 49, 51 (1963) ("exhortation to `square with the State, or the City, whoever the crime was against' and with the `man upstairs' ... was the equivalent of an inducement, rendering the statement inadmissible...") If you will recall, Sheriff Forbes could not deny that Abram was encouraged to do right by God, and Reverend Jones definitely discussed the religious ramifications of Abram's action.
We conclude that the various statements and impressions conveyed to Abram proximately caused him to confess, as he testified. *1034 They were more than sufficient to render his confession involuntary. At a minimum, there was reasonable doubt over the voluntariness of Abram's confession. The circuit court's refusal to suppress the confession just because Abram was educated was manifestly wrong.

E. Right to counsel[4]
The right to counsel issue is controlled by the immediately preceding discussion because voluntariness of the waiver of right to counsel is one of the essential components in the overall inquiry regarding admissibility of the confession. Saucier v. State, 562 So.2d 1238, 1244 (Miss. 1990). We may fairly infer that the circuit court in refusing to suppress the statement, found Abram's waiver of right to counsel voluntary. Id. The record says otherwise.
Abram enjoys both a right to remain silent and a right to counsel by virtue of Section 26 of the state constitution. These rights are secured in the federal constitution by the Fifth and Sixth Amendments. Abram's right to counsel under state law attached once Abram had been taken into custody and at least functionally arrested, and all "reasonable security measures (of evidence and persons) ha[d] been completed." Nicholson v. State, 523 So.2d 68, 76 (Miss. 1988). Because Abram was not interrogated until he was at least functionally under arrest and all security and booking needs had been met, his right to remain silent and his right to counsel essentially merged.
It is reasonably clear that Abram was repeatedly Mirandized during the interrogation process, and there is disputed testimony at best that Abram ever invoked these rights. It is likewise clear that Abram responded to questioning after being warned, and executed one, and possibly two, written waivers of his rights, one at the time he was administered a polygraph exam, and the other at the time he confessed. Abram arguably made a knowing and intelligent waiver of his right to counsel as well as his right to remain silent when he executed a written waiver prior to confessing, regardless of whether these rights had been previously invoked. Saucier, 562 So.2d at 1244.
As alluded to above, however, this issue turns on the voluntariness of Abram's waiver, for any waiver of these valuable rights must not only be knowing and intelligent, it must be voluntary. Id.; Powell v. State, 540 So.2d 13, 16 (Miss. 1989). Based on the detail set forth above regarding the voluntariness of the confession, Abram's waiver of his right to remain silent and right to counsel was no more voluntary than his confession. Both were inextricably bound, and the product of, prolonged coercive police interrogation. There is no way to conclude in this case that Abram's waiver of these rights was voluntary, yet his confession given immediately thereafter was not.

F. Summary
In sum, we find Abram's confession inadmissible because (1) it was involuntary, having been proximately caused by the improper coercion of law enforcement interrogators and/or third parties connected therewith; (2) it was secured in the absence of a voluntary waiver of his right to remain silent and right to counsel; and (3) because of the State's failure to provide him a prompt initial appearance. We find the arrest of Abram was legal because based on sufficient probable cause, and we find no Agee violation.
Although the previous discussion requires that we vacate and set aside Abram's conviction and sentence, we will address the remaining assignments of error to the extent necessary to prevent their possible recurrence on remand.

IV.

DID THE COURT ERR BY REFUSING TO GRANT A MURDER INSTRUCTION?
The sole piece of evidence linking Donald Abram to this crime was his confession, *1035 and it was this confession which brought about his conviction. Abram offered two lesser offense instructions, one for armed robbery and one for simple, malice aforethought murder. The court refused to instruct on murder because it felt malice aforethought was not present. The court did grant the armed robbery instruction over objection of the District Attorney.
Abram argues that his proposed murder instruction was improperly refused. The law is well stated in Mease v. State, 539 So.2d 1324 (Miss. 1989):
... "[T]he evidence in a particular case generally warrants granting a lesser offense instruction if a `rational' or a `reasonable' jury could find the defendant not guilty of the principal offense charged in the indictment yet guilty of the lesser included offense." Only where the evidence could only justify a conviction of the principal charge should a lesser offense instruction be refused. (emphasis in original) [citations omitted].
539 So.2d at 1329-30.
See also Toliver v. State, 600 So.2d 186, 189 (Miss. 1992); Mackbee v. State, 575 So.2d 16, 23 (Miss. 1990); Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985).
Here, the trial judge granted the only instructions which were warranted by the evidence. There is not the slightest evidentiary suggestion that Abram was guilty of the malice aforethought murder of Percy Quin. "An essential element of the crime of [malice aforethought] murder is the felonious and premeditated intent to kill ..." Nicolaou v. State, 534 So.2d 168, 174 (Miss. 1988). Too, the evidence must support a finding that the killing was not committed during the commission of armed robbery in order to justify a simple murder instruction.
The evidence, as revealed in Abram's confession, shows armed robbery, and also reflects Abram's defense that he did not kill and did not intend to kill. Notwithstanding, he proposed a murder instruction which asked the jury to find him guilty of simple, malice aforethought murder if they believed from the evidence that "Donald Ray Abram ... killed Percy Quin ... not in necessary self defense," but with "the premeditated and deliberate design to effect the death of the person killed."
The State correctly points out that "there were but three plausible evidentiary" theories: Capital murder, which is justified by a finding that Abram participated in an armed robbery contemplating that lethal force would be used; armed robbery, which is justified by a jury finding that Abram agreed to the armed robbery but was completely unknowing as to any killings and did not contemplate the use of lethal force; and acquittal.
No reasonable or rational jury could have found Abram guilty only of simple, malice aforethought murder, and at the same time not guilty of capital murder. The killing undeniably occurred during the commission of armed robbery. The killing, therefore, could only be capital murder, regardless of whether Abram possessed malice aforethought. See Miss. Code Ann. § 97-3-19(1)(c), (2)(e) (Supp. 1991). The refusal to instruct on simple murder was proper.

V.

DID THE TRIAL COURT ERR BY REFUSING TO QUASH THE VENIRE PANELS AFTER THE PROSECUTOR USED HIS PEREMPTORY CHALLENGES TO EXCLUDE BLACKS FROM THE JURY?
The prosecutor exercised peremptory challenges to strike five (5) black prospective jurors, leaving only two (2) black alternates. The defendant moved to quash the jury panel because of the prosecutor's alleged systematic exclusion of blacks. This motion was overruled. A renewed motion was likewise overruled.
The prosecutor later went on record with reasons for his exclusion of the 5 black prospective jurors. Prospective juror Annie Henrietta Boone was struck because she was 71 years old. Prospective juror Glen Tyrone Chisolm was struck because he indicated during voir dire that he knew Donald Abram. Prospective juror Larry Lendell Rawls was struck because he had a *1036 first cousin who served as a juror in the trial of Abram's co-defendant, Herman Barnes. Prospective juror Brown was struck because he indicated he knew Donald Abram. There was no explanation regarding the fifth black prospective juror.
While the case was pending on appeal, the United States Supreme Court decided the case of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Batson held in sum that a prosecutor's use of peremptory challenges to systematically exclude blacks from a jury trying a black defendant may be constitutionally impermissible. Finding Abram's appeal in the "proper window," the Court remanded this case to the lower for a Batson hearing, with the following instructions:
Under the Harper rationale, this case must be remanded to the lower court to determine if the appellant can establish a prima facie case of the constitutionally impermissible exclusion of the black jurors. The prosecutor must then enumerate neutral, non-racial explanations for those peremptory challenges, which the appellant may rebut, if [he] can. If purposeful discrimination is found, the lower court must order a new trial; if it is not found, the cause should be certified to this Court, along with the record of the hearing and finding of fact by the lower court.
Abram v. State, 523 So.2d 1018, 1019 (Miss. 1988) (citations omitted).
The case was returned to this Court, obviously signifying that no purposeful discrimination was found by the lower court. In reviewing this issue, we recognize that the State may rebut the defendant's prima facie case with non-racial explanations which "`need not rise to the level of justifying exercise of a challenge for cause' ... but may not include the prosecutor's `assumption  or his intuitive judgment  that they [black jurors] would be partial to the defendant because of their shared race.'" Goggins v. State, 529 So.2d 649, 651-52 (Miss. 1988), citing Lockett v. State, 517 So.2d 1346, 1352 (Miss. 1988) and Williams v. State, 507 So.2d 50, 52 (Miss. 1987).
As noted above, the State originally offered non-racial reasons for the exclusion of 4 out of the 5 black prospective jurors. On May 2, 1988, and again on September 26, 1988, a hearing was held by the circuit court where the State again offered reasons for the exclusion of the 5 black prospective jurors.
Regarding prospective juror Annie Henrietta Boone, the prosecutor offered three reasons for her exclusion: (1) because she was 71 years old, leading the prosecutor to believe she would have difficulty serving in a potentially protracted trial, (2) because she was inattentive during voir dire, and (3) because she lived in the "Hub Community" which led prosecutors to believe she probably knew Abram's family.
Regarding prospective juror Peggy J. Smith, the prosecutor offered two reasons for her exclusion: (1) because her brother had been prosecuted for capital murder in 1983, and ultimately was convicted and sentenced for manslaughter, and (2) because prosecutor's were given the indication during voir dire that she had a "problem with the death penalty."
Regarding prospective juror Glen Tyrone Chisolm, the prosecutor offered the following reasons for his exclusion: (1) because he knew the defendant to the extent his vote might be affected, (2) because he was related to Darnell Rawls, a person who had earlier been prosecuted for the capital murder of a law enforcement officer, and (3) because of information from former Sheriff Forbes that Chisolm had brushed with the law as a juvenile.
Regarding prospective juror Larry Lendell Rawls, the prosecutor offered the following reasons for his exclusion: (1) because he too was related to Darnell Rawls, and (2) because Larry Rawls' first cousin served on the jury in one of the trials of Herman Barnes, Abram's co-defendant.
Regarding prospective juror Wilbur Brown, the prosecutor offered the following reasons for his exclusion: (1) because he lived in the "Hub community" and knew Donald Abram, and (2) because Brown was 72 or 73 years old, and like prospective *1037 juror Boone, was inattentive during voir dire, leading prosecutors to believe he couldn't effectively serve for the duration of a potentially protracted trial. The prosecutor added later that Brown was objectionable because he did not fill out the questionnaire properly.
In our opinion, the State adequately rebutted Abram's prima facie case, and the trial court correctly denied relief.

VI.

DID THE TRIAL COURT ERR BY REFUSING TO GRANT ABRAM A DIRECTED VERDICT ON THE CHARGE OF CAPITAL MURDER?
Without citation to authority, Abram argues that a directed verdict should have been granted on the charge of capital murder. His motion to this effect at trial was overruled.
Abram was tried and convicted for the capital murder of Percy Quin, the store customer killed during the armed robbery. Abram argues that the evidence (his confession) is insufficient to sustain a verdict of capital murder because it does not show that Percy Quin was the victim of the underlying felony, and because it does not show that Quin was killed "during the commission" of the robbery. Each of these claims is easily disputed.
First, the statute under which Abram was convicted defines capital murder as "[t]he killing of a human being without the authority of law by any means or in any manner ... [w]hen done with or without any design to effect death, by any person engaged in the commission of" certain felonies, of which robbery is one. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1991).
Abram is clearly incorrect in suggesting that it is the intended victim of the underlying felony who must be killed in order for the murder to be capital. To the contrary, the killing of any human being during the commission of one of the enumerated felonies, whether it be the intended victim of the underlying felony or any intervenor, will substantiate a capital murder conviction. Cf. Layne v. State, 542 So.2d 237, 243-44 (Miss. 1989).
Abram also argues that the evidence is insufficient to support a conviction of capital murder because it does not show that Percy Quin was killed "during the commission" of the armed robbery. This argument is easily dispelled by language in Culberson v. State, 379 So.2d 499, 504 (Miss. 1979). There the Court stated:
In our opinion, the statutory language, "engaged in the commission of," includes the attempt to commit the constituent felony, the completed constituent felony, as well as the immediate post-felony acts of the accused so connected to the cardinal charge as to become a part of it, the res gestae. [citations omitted].
Abram's attempt to portray Quin's killing as an act wholly separable from the underlying robbery defies any reasoned application of the statutory language. There is no basis for concluding "that the robbery had become a past fact such that [Abram] was not still engaged in its commission [citation omitted], i.e. [Abram] had not yet made good his escape" when Quin was killed. Layne v. State, 542 So.2d at 244.
In short, the evidence as reflected in Abram's confession is more than sufficient to support a valid conviction under § 97-3-19(2)(e) which requires only that the proof show that a killing took place while the accused was engaged in the commission of one or more of the enumerated felonies. Layne v. State, 542 So.2d at 243; White v. State, 532 So.2d 1207, 1221 n. 2 (Miss. 1988). We note that on remand, unless new evidence is offered on this point, the State cannot carry its burden because the confession will be inadmissible.

PENALTY PHASE
The remaining aspect of the direct appeal, and the cross-appeal, are concerned with a single alleged irregularity in the penalty phase of the trial. Accordingly, the remaining assignments of error will be considered jointly. Abram tenders the following assignment:
THE TRIAL COURT CORRECTLY GRANTED APPELLANT A JUDGMENT *1038 NOTWITHSTANDING THE VERDICT, HOWEVER, THE COURT ERRED BY SENTENCING APPELLANT PURSUANT TO MISSISSIPPI CODE ANNOTATED, SECTION 99-19-107 (SUPP. [1991]).
The State, on cross-appeal, alleges:
THE TRIAL JUDGE EXCEEDED HIS AUTHORITY BY STAYING IMPOSITION OF THE JURY'S LAWFUL SENTENCE AND IMPOSING IN ITS STEAD A SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE.
THE TRIAL JUDGE IMPROPERLY INTERPRETED AND APPLIED ENMUND V. FLORIDA TO THE FACTS IN THE PRESENT CASE.

VII.
Via pre-trial motions, Abram sought to exclude the application of the death penalty due to his role as a non-trigger man. These motions raised a claim of proportionality and invoked Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). These motions were taken under advisement by the trial judge, and so held until the conclusion of trial. The claims were renewed via post-trial Motion for New Trial or Judgment Notwithstanding the Verdict.
The matter of sentence was allowed to go to the jury on proper instruction whereupon the jury unanimously returned a sentence of death. The jury found consistent with Enmund v. Florida that Abram "contemplated that lethal force would be used." Miss. Code Ann. § 99-19-101(7)(d) (Supp. 1991). In aggravation, the jury found that "the capital offense was committed while the defendant was engaged, or was an accomplice in the commission of an armed robbery." Miss. Code Ann. § 99-19-101(5)(d) (Supp. 1991). The jury found "insufficient mitigating circumstances to outweigh the aggravating circumstance." Miss. Code Ann. § 99-19-101(3)(c) (Supp. 1991).
Approximately one week following the return of the jury's verdict, on April 6, 1984, the trial judge entered an Order of Conviction and Sentence. Therein, the court found the verdict of the jury to be in proper form, but stayed the setting of an execution date until it ruled on Abram's Enmund v. Florida and proportionality claims. In an Opinion and Order handed down April 19, 1984, the trial judge found that the death penalty was unconstitutional as applied to Abram under Enmund v. Florida. As a result, the court sentenced Abram pursuant to Miss. Code Ann. § 99-19-107 (Supp. 1991) to life imprisonment without parole, and permanently stayed the imposition of the death sentence handed down by the jury.

A. Right of State to Cross-Appeal
Abram challenges the right of the State to proceed as an appellant in this case. Both sides correctly note that the answer lies in Miss. Code Ann. § 99-35-103(c) (Supp. 1991).[5] That section provides in part that the State may appeal in a criminal case:
From a ruling adverse to the state or municipality in every case in which the defendant is convicted and prosecutes an appeal; and the case shall be treated as if a cross appeal had been formally presented by the state. All questions of law thus presented shall be decided by the Supreme Court.
The State asserts, accurately in our opinion, that it seeks review of an error of law, or at least in the application of law to the facts, committed by the trial judge after the jury had returned proper verdicts as to guilt and sentence. Thus, the questions raised fit squarely within the statute. Thomas v. State, 73 Miss. 46, 19 So. 195 (1895) resolves this dispute in favor of the State.
There the defendant was convicted and sentenced to five years. Afterward, the court denied defendant's request for new trial, but set aside the original sentence and imposed in its stead a sentence of six *1039 months because it considered the conviction a misdemeanor, not a felony. 19 So. at 195-96. The defendant objected to the denial of his motion for new trial, and the State objected to the setting aside of the sentence. The Court held under the predecessor to § 99-35-103(c) that the State's cross-appeal was proper. 19 So. at 196. We here hold likewise.

B. Life Without Parole
After declaring the death sentence unconstitutional, the trial judge sentenced Abram pursuant to § 99-19-107 to life without parole. That section provides:
In the event the death penalty is held to be unconstitutional by the Mississippi Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death shall cause such person to be brought before the court and the court shall sentence such person to imprisonment for life, and such person shall not be eligible for parole.
The trial judge viewed this section as applicable in light of his finding that the death penalty in this case was unconstitutional under Enmund v. Florida. Enmund, as codified in § 99-19-101(7), requires prerequisite to imposition of a death sentence a finding beyond a reasonable doubt that the defendant killed, attempted to kill, intended that a killing occur, or contemplated that lethal force would be used.
Although there are no cases addressing the precise application of § 99-19-107, we think it fairly obvious that it is reserved for that event when either this Court or the United States Supreme Court makes a wholesale declaration that the death penalty in general, and/or our own statutory death penalty scheme in particular, is unconstitutional. This section is not reasonably or logically intended for use on a case by case basis by trial courts or this Court in conjunction with Enmund analysis.
The only logical alternative once the jury verdict was disregarded would have been to impose a sentence of life imprisonment. See Miss. Code Ann. § 99-19-101(3), 103, 105(5)(b) (Supp. 1991).

C. Authority to Disregard Jury Verdict
It is contended by the State that the trial court "grossly exceeded its function as set by statute and in essence usurped the exclusive province of the sentencing jury" in the capital sentencing scheme. Abram contends simply that the trial court in fact properly granted a judgment notwithstanding the verdict of the jury.
Our first task is to determine, if possible, exactly what the trial judge did. First, it is not at all clear that the trial judge actually set aside the death sentence. Prior to the sentencing phase, and again prior to the retirement of the jury for sentencing, Abram reasserted his Enmund and proportionality claims, but the court kept those matters under advisement. It was not until the jury returned a sentence of death that these issues were resolved. At the hearing on this matter, the trial judge stated:
[T]he Court finds that under the statute it has no authority, in fact, is mandated to impose the sentence of the jury, that being the sentence of death, and the Court is prepared to impose that at this time. However, because of these legal issues and what is going to happen in that regard, then I will stay, will not set a date for the execution as the statute requires, but will delay that until a decision has been reached on this constitutional question.
Later, the trial judge stated:
There is no doubt in this Court's mind that the decision [on Enmund] is correct. For that reason, the Court did accept it and make its ruling that the death penalty, the imposition of the death penalty in this particular case under the facts in this particular record is unconstitutional. Being as that is the case, the Court finds that the verdict of death must be stayed and that the defendant must be committed to the custody of the Mississippi Department of Corrections to serve the rest of his life imprisoned in *1040 their custody without any eligibility for parole.
Still later, the trial judge stated:
That law [Enmund] is changing ... That, as I say, is changing, and that is the reason I have originally just stayed  if you'll notice in that order, I'm just staying the execution of the death penalty, thereby, that I feel like if the case is appealed to the Mississippi Supreme Court ... that the Mississippi Supreme could set aside my stay of that execution and impose the death penalty. I think that is still an option that is available if the defendant appeals this case. I kept it open like that for that reason.
Following this, the trial judge expressly overruled Abram's post-trial motion for new trial or judgment notwithstanding the verdict. Thus, regardless of what the trial judge did, he at least thought he was not granting a judgment notwithstanding the verdict; instead, he was merely staying the imposition of the jury's sentence. He admitted his belief "that the jury did make a proper interpretation or determination" on proper instructions.
In the Order of Conviction and Sentence, it is stated:
That the Court finds that the verdict was in the proper form and that the Defendant should, under the jury verdict, be sentenced to death with an execution date to be set by the Court under Mississippi Code Section 99-19-49.
* * * * * *
IT IS THEREFORE ORDERED AND ADJUDGED by the Court that Donald Ray Abram is guilty of CAPITAL MURDER.
IT IS FURTHER ORDERED AND ADJUDGED by the Court that Donald Ray Abram be and he is hereby sentenced to suffer the penalty of death on the charge of CAPITAL MURDER as set by the jury.
IT IS FURTHER ORDERED AND ADJUDGED that the date for setting the execution of death be and the same is hereby stayed until the Court rules on the motions raised in the Enmund v. Florida, supra, and subsequent decisions regarding the felony murder doctrine on one not directly participating in the murder.
In ultimately ruling on these motions, the trial judge entered an Order Permanently Staying Imposition of Death Sentence and Committing Defendant to Life Imprisonment Without Eligibility for Parole. It stated in part:
II.
That the Court on April 6, 1984 in accordance with the verdict and Mississippi law, entered an order of conviction of guilty of capital murder and sentencing to death, but stayed the setting of an execution date to consider this motion of the Defendant.
* * * * * *
IV.
That in this case the State has failed to prove beyond a reasonable doubt that Donald Ray Abram had the requisite mental intent to murder and therefore his sentence of death cannot be constitutionally imposed.
V.
That under Section 99-19-107 of the Mississippi Code of 1972 ... this Court has no other recourse but to permanently stay the imposition of the death sentence ...
IT IS THEREFORE ORDERED AND ADJUDGED that the sentence of death heretofore given the Defendant, DONALD RAY ABRAM, be and the same is hereby stayed and permanently prevented from being carried out as long as this Court retains jurisdiction over Defendant.
In form, the trial judge merely stayed imposition of the death sentence. But, as paragraph IV of the final order set forth immediately above indicates, the trial judge in fact ruled that the State's evidence was insufficient to support the jury's finding of a requisite Enmund factor. This fact is made clearer elsewhere in the record. In its Opinion on Application of the Death *1041 Sentence, the circuit court engaged in a lengthy review of the evidence offered by the State, and applied the law as it understood it to that evidence. The court's opinion stated in relevant part:
At the sentencing trial there must now be proof beyond a reasonable doubt that the defendant was involved in more than the underlying felony and had the mental intent sufficient to be personally culpable for the distinct crime of murder ...
For infliction of the death penalty on Abram there must be proof that the defendant ...

There is no way to constrain this record by any rational trier of the facts, taking the facts as presented at this trial and all reasonable inferences therefrom in favor of the State but without extending them beyond what they are, to say that Donald Ray Abram armed himself, that he knew that a life would be taken, that there was any intent on his part to take a life, that he was present during the killings or that he aided, abetted, or participated in or facilitated in any manner the actual killings themselves.
This Court finds that ... the imposition of the death penalty ... absent proof of personal culpability of this defendant for this crime of murder in this case, would violate the Eight and Fourteenth Amendment constitutional requisites of the United States Constitution as set out in Enmund v. Florida, supra. (emphasis added).
As set forth earlier, the circuit court stated in its final Order that the "State failed to prove beyond a reasonable doubt" the existence of a requisite Enmund factor. The trial judge's standard of review of the evidence, as set forth above, is identical to the standard employed when ruling on a motion for judgment notwithstanding the verdict; it is a non-movant biased review of the sufficiency of the evidence. See e.g., Harper v. State, 478 So.2d 1017, 1019 (Miss. 1985).
Elsewhere in the record, the Court stated that evidence of "[c]arrying a shotgun in for the commission of an armed robbery... is insufficient" to support an Enmund finding. (emphasis added). Furthermore, the arguments of counsel precipitating this ruling were directed at the meaning of Enmund and the sufficiency of the evidence to support an Enmund finding.
As confusing as this scenario is, the State's argument is more so. The State goes to great lengths arguing over the form of the lower court's ruling without regard to the substance of that ruling. The State challenges the judge's authority to stay or suspend a death sentence duly returned by a jury, though never precisely settling on exactly what the trial judge accomplished.
In our view, the lower court registered a finding that the evidence of the State was insufficient to support a requisite Enmund finding. The State acknowledges that the trial court's ruling is "functionally tantamount to stating that there was insufficient evidence presented by the State to carry the issue to the jury." Brief of Cross-Appellant at 11.
Thus treated, the State's argument on cross-appeal evaporates for they readily concede that "[u]nder powers historically accorded trial judges, the judge may let the case go to the jury and analyze these claims anew in the context of a post-verdict motion for new trial or in the alternative for judgment notwithstanding the verdict." Brief of Cross-Appellant at p. 10-11; accord Dycus v. State, 440 So.2d 246, 259 (Miss. 1983) (Roy Noble Lee, specially concurring); Williams v. State, 427 So.2d 100, 106 (Miss. 1983) (recognizing power of trial court in capital case to rule against death penalty via judgment notwithstanding the verdict).
Accordingly, the question we are left with is whether the trial court properly interpreted and applied Enmund v. Florida to the facts in this case.

D. Enmund v. Florida

On appeal, "we review the evidence and all reasonable inferences which may be drawn therefrom in the light most consistent with the verdict. We have no authority to disturb the [jury] verdict short *1042 of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found the fact at issue beyond a reasonable doubt." White v. State, 532 So.2d 1207, 1220 (Miss. 1988). This is the guide for testing the legal sufficiency of the evidence to support a finding under § 99-19-101(7), and logically, the trial judge was bound by the same rule when he undertook his review of the jury's finding on this issue.
Both sides concede that it was a properly instructed jury which found pursuant to § 99-19-101(3)(a), (7)(d), that Donald Abram "contemplated that lethal force would be used." The question on appeal is whether this finding is supported by the evidence, or more particularly, whether the trial judge properly defined and applied this phrase to the facts of this case.
In the federal context, there is little doubt that the evidence here is sufficient to satisfy the Enmund culpability requirement given Abram's "major participation in the felony committed, combined with [the supportable finding] of reckless indifference to human life." Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127, 145 (1987).
However, as noted in Tison, and affirmed in Minnick v. State, 551 So.2d 77, 98 (Miss. 1988), reversed on other grounds 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), Mississippi by statute requires more in the felony-murder scenario than major participation and reckless indifference to the value of human life. 481 U.S. at 154, n. 10, 107 S.Ct. at 1686, n. 10, 95 L.Ed.2d at 142, n. 10. And obviously, "mere tort foreseeability  an objective, reasonable man approach  falls well short of what the statute requires." White v. State, 532 So.2d 1207, 1221 (Miss. 1988).
The circuit court, in a lengthy opinion, explored the meaning of § 99-19-101(7)(d) in order to determine whether there was sufficient evidence to prove that Abram "contemplated that lethal force would be employed."[6] It arrived at the conclusion that something more than the "possibility" of lethal force being used must be shown; the defendant must actually "intend" that lethal force be used.
The circuit court was right to conclude that something more than a "possibility" is required. But the court went too far in the other direction when it concluded that there are only three tests under Enmund, and that under § 99-19-101(7), subsections (c) and (d) are conjunctive. The court at times appeared to zero in on the precise meaning of subsection (d) by restricting its application to those killings which are a "necessary or probable result of the initial felony." But the circuit court ultimately applied a more restricted interpretation of § 99-19-101(7)(d) by requiring proof of actual intent to kill, an interpretation which for all practical purposes blurs any distinction between subsections (c) and (d) of § 99-19-101(7).
This Court, on the other hand, has articulated at least some difference between subsections (c) and (d). This articulation is at odds with the circuit court's opinion that, under Enmund, subsections (c) and (d) are used in conjunction to cover those cases where either the defendant himself actually intends to kill or where the defendant actually intends for his co-felon to kill. According to the circuit court, there must be proof in either case of an actual intent or definite plan or design to kill. We say otherwise, however, to the end that the evidence in this case is sufficient to justify a rational jury in finding beyond a reasonable doubt that Abram possessed the necessary level of culpability.
In White v. State, we stated as follows:
We are less than certain of the precise difference between Subsection (c), "the defendant intended that a killing take place, and Subsection (d), "the defendant *1043 contemplated that lethal force would be employed." Subsection (c) has reference to the defendant's mental purpose and design that someone's life be taken. But what of Subsections (d)'s contemplation of lethal force? The two surely are not synonymous, although "contemplate" is one synonym for intend. See Roget's International Thesaurus § 653.7 (4th ed. 1977). This alone excludes the notion that Subsections (c) and (d) describe two mutually exclusive categories of culpability.
Careful attention to the King's English, definitional and grammatical, leads to the view that Subsection (c) is subsumed in Subsection (d), for we cannot imagine a case in which a defendant intended that a killing take place but somehow did not contemplate the use of lethal force. In this sense, Subsection (c)'s "intended that a killing take place" is surplusage and may with profit be set aside.
But the converse is not necessarily so. One may contemplate lethal force while stopping short of a definite plan or design to kill. In a sense, Subsection (d) describes a contingent intent. Where, as a part of pre-crime planning, a defendant includes in his plans the substantial probability that fatal force will be employed, Subsection (d) is satisfied. On the other hand, mere tort foreseeability  an objective, reasonable man approach  falls well short of what the statute requires.
532 So.2d at 1220-21. (emphasis in original).
The Court goes on to point out certain evidence which, in White at least, bears directly on the issue. For instance, it is relevant to know which robber did the killing, whether the defendant himself handled the murder weapon prior to its use as an instrument of deadly force, whether the defendant himself was aware prior to the killing of the presence of the murder weapon, and who supplied or carried the weapon used to kill. 532 So.2d at 1221-22. All of these facts are relevant in the individualized consideration of whether Abram contemplated prior to the armed robbery that lethal force would be employed.
Abram's confession reveals that he willingly and knowingly accompanied Herman Barnes to the Quick Stop with the specific, actual intent to commit a robbery. He was perfectly aware of the fact that Barnes brought along a shotgun with shells which Barnes stated was needed "for security." On location, Abram watched as Barnes entered the store with the loaded shotgun, then entered the store himself at Barnes' request. After the fact, Abram claims he never intended for anyone to be killed.
Subjectively, we may never know what Abram intended or contemplated. However, it seems to us that a fair-minded and rational jury, drawing on these facts and any reasonable inferences arising therefrom, could have concluded beyond a reasonable doubt that Abram "included in his plans the substantial probability" that the loaded shotgun would be used as an instrument of lethal force "to insure the robbery's success." White, 532 So.2d at 1221-22; Cabello v. State, 471 So.2d 332, 346 (Miss. 1985), cert. denied 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986).
Accordingly, we hold the trial court erred in its interpretation and application of § 99-19-101(7)(d) to the facts of this case. The jury's finding that Abram contemplated the use of lethal force was within the permissible range of law and evidence. Again we note, however, that absent new, admissible evidence on remand sufficiently implicating Abram, a finding under § 99-19-101(7)(d) will not be justified.

CONCLUSION
In the end, we hold the trial court erred, for the reasons previously set forth, in admitting the confession of Donald Ray Abram, and in setting aside the death sentence and imposing in its stead a sentence of life imprisonment without parole. The conviction of Donald Ray Abram for capital murder is therefore reversed, the sentence of death vacated and set aside, and this cause remanded to the Circuit Court of Marion County for such further proceedings as may be appropriate.
*1044 CONVICTION OF CAPITAL MURDER REVERSED, SENTENCE OF DEATH VACATED AND SET ASIDE, AND CAUSE REMANDED TO THE CIRCUIT COURT OF MARION COUNTY FOR SUCH FURTHER PROCEEDINGS AS MAY BE APPROPRIATE.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER and ROBERTSON, JJ., concur.
As to part III(A) only: HAWKINS and DAN M. LEE, P.JJ., concur.
SULLIVAN, J., dissents with separate written opinion joined by PRATHER and ROBERTSON, JJ.
PITTMAN, BANKS and McRAE, JJ., not participating.
SULLIVAN, Justice, dissenting only as to part III(A):
While I obviously find myself in complete agreement with the majority as to the ultimate result, and with regard to most of the claims raised on appeal, I cannot accept the conclusion in Part III(A) that the arrest of Donald Ray Abram was based on sufficient probable cause, and therefore, I respectfully dissent.
I agree with the majority that the key, initial question is whether in fact Sheriff Forbes had probable cause to make a warrantless arrest of Abram. Where our views diverge, and radically so, is at the point of deciding whether probable cause was present.

A. Probable Cause
The relevant facts have been more than adequately set forth in the majority opinion. And for the most part, the majority opinion's statement of the law is both sufficient and correct. However, it is in the application of law to fact that I feel the majority turns back the clock and pays mere lip service to the clear requirements of the law.
As Forbes' testimony indicates, he had information from two informants implicating Barnes and Abram. One informant he knew, from past experience, to be reliable. The Sheriff had no corroborating information. He didn't know anything about their basis of knowledge, and he asked no questions.
Trying as I should to view this information "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," Illinois v. Gates, 462 U.S. at 232, 103 S.Ct. at 2329, 76 L.Ed.2d at 544, I can't help but believe, based on the record before this Court, that Sheriff Forbes lacked the requisite probable cause to arrest and detain Abram without a warrant.
At best, Forbes had only a "reasonable suspicion." Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); United States v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). And because the suspicion related to "past criminality" I find apt the words of Justice Marshall dissenting in Sokolow that "suspicions of past criminality demand no such immediate action, but instead should appropriately trigger routine police investigation, which may ultimately generate sufficient information to blossom into probable cause." 490 U.S. at 13, 109 S.Ct. at 1588, 104 L.Ed.2d at 14.
Alabama v. White involved an anonymous tip that "Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache case." 496 U.S. at 327, 110 S.Ct. at 2414, 110 L.Ed.2d at 306-07. Officers located the automobile described at the Lynwood Terrace Apartments, observed White leave, though empty handed, and followed her as she took a direct path to Dobey's Motel. Just prior to her destination, she was stopped on suspicion of carrying cocaine. Id.
The Court approved the Terry stop, although admitting that this was a "close case" of even reasonable suspicion. The fact that officers corroborated some of the details, and the fact that the tipster's ability *1045 to predict White's "future behavior ... demonstrated inside information," weighted the scales in favor of the Terry stop. The Court noted that a lot of the tip related to facts existing at the time of the call which anyone could have obtained, such as the fact that White had a brown car with a broken taillight; but what was important was the caller's ability to predict White's future course of conduct, as corroborated by police. 496 U.S. at 331, 110 S.Ct. at 2417, 110 L.Ed.2d at 310.
In the present case, Sheriff Forbes' informers did not in any way demonstrate that they had access to "inside information." There was a 50/50 chance that Barnes was the trigger man, a fact that anyone could reasonably have predicted. The tip to Sheriff Forbes contained none of the details found in Abram's confession. This is not to say that such is the test, but the tip contained only the one detail that was most predictable. The informers apparently knew nothing about how the robbery/murder transpired. They likewise were not questioned about the basis of their information.
Alabama v. White makes clear that even in the less-demanding area of reasonable suspicion, whether the test is met is "dependent upon both the content of the information possessed by the police and its degree of reliability." 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309. Here, the State offered only a general allegation of the reliability of one informant based on his past use.
The Court in Gates reiterated "the value of corroboration..." 462 U.S. at 241-42, 103 S.Ct. at 2334, 76 L.Ed.2d at 550. Quoting from Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), overruled on other grounds by U.S. v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the court observed that "in making a warrantless arrest an officer `may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'" Id. Sheriff Forbes simply had no "substantial basis for crediting the hearsay" of his informers. And according to Gates, the Fourth Amendment requires a "conscientious assessment of the basis for crediting such tips," though not such an assessment as would leave "virtually no place for anonymous citizen informants." 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.
In fact, the totality of the circumstances test by definition considers the reliability and basis of knowledge of the informant-"highly relevant" factors which must be present before probable cause can be found to exist in cases such as this, although a strong showing of one may compensate for a weak showing of the other. See, Alabama v. White, 496 U.S. at 328, 110 S.Ct. at 2415, 110 L.Ed.2d at 308-09. The test is whether, given all the circumstances present, "including veracity and basis of knowledge of the person supplying the information," there is probable cause. Breckenridge v. State, 472 So.2d 373, 376 (Miss. 1985); see also, e.g., Smith v. State, 504 So.2d 1194 (Miss. 1987) (past use reliability plus personal observations of the informant); Alexander v. State, 503 So.2d 235 (Miss. 1987) (detailed information that suspect was selling drugs on a particular street corroborated by several anonymous calls plus officer's personal surveillance); Garvis v. State, 483 So.2d 312 (Miss. 1986) (past use reliability plus "specific, facially credible details"); Jones v. State, 481 So.2d 798 (Miss. 1985) (past use reliability plus personal observations of informant plus corroboration by police); Breckenridge v. State, 472 So.2d 373 (Miss. 1985) (past use reliability plus personal observations of the informant plus a declaration by the informant against his penal interest).
There are a couple of arguable exceptions to this pattern, but each is distinguishable. In Moore v. State, 493 So.2d 1295 (Miss. 1986), the police had only an informant's tip that Moore committed the crime under investigation. There was no physical evidence and no independent corroboration of the tip. Notwithstanding, the Court, relying on Kelly v. State, 493 So.2d 356 (Miss. 1986), held that probable cause existed "[g]iven the fact the information *1046 from Carbins [the informer] implicated both Moore and Carbins' brother." 493 So.2d at 1298. This fact gave the tip a heightened indicium of reliability.
Moore and Kelly are easily distinguishable for the reason that information which is against the penal interest of the informer or his immediate family carries with it a heightened indicium of reliability which will compensate for the absence of physical evidence, corroboration, or basis of knowledge. See United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (recognizing that admissions against interest heighten the reliability of the tip). What Moore and Kelly clearly do not say is that past use reliability alone will overcome the complete absence of any basis of knowledge, physical evidence or other corroboration.
Secondly, there is Thomas v. State, 340 So.2d 1 (Miss. 1976), where probable cause to issue an arrest warrant was based solely on an informant's tip that the defendant had entered "the Price house" and taken a fan which was now located at the defendant's house. The Court considered this tip to have been corroborated by the fact that the fan was missing from the Price house. 340 So.2d at 3. Of course, the tip in the present case is just as easily corroborated by the fact that an armed robbery and murder had occurred at John's Quick Stop.
What sets Thomas apart is the fact that the informer therein was clothed with a heightened degree of reliability because he had given accurate information to police about three previous burglaries. This, and the fact that he stated that the fan was in the defendant's house, could arguably justify a finding that the tipster had "inside information." More important, the Court in Thomas ultimately held that, even assuming a lack of probable cause, the defendant was not prejudiced because he admitted at trial that he had the fan, and his accomplices testified against him. 340 So.2d at 3. Thomas is simply not precedent for a finding of probable cause to arrest Donald Abram.
In sum, the State failed to establish the existence of probable cause to arrest Donald Abram on Thursday, August 12, 1982. Sheriff Forbes had only the uncorroborated tip of two informers, one of whom was only arguably reliable based on past use. This, without more, does not establish probable cause under any test. Consequently, the arrest of Donald Abram on August 12, 1982, was illegal.

1.
I also wish to make clear my view that Judge Speights lacked probable cause to issue the arrest warrants. He had less information to rely on than did the Sheriff. Speights testified he relied solely on the affidavits presented by the Sheriff, and the Sheriff's assurance that probable cause was present. And though the law allows that criminal affidavits may be supplemented by oral testimony to the issuing magistrate, there is no indication from the record that this practice was followed in this case. See Hester v. State, 463 So.2d 1087 (Miss. 1985).
The only things presented to Judge Speights were three (3) affidavits, identical in form and substance but for the crime charged. Those affidavits recited that Sheriff Forbes, on oath and information, believed that:
DONALD RAY ABRAM DID WILFULLY, UNLAWFULLY, AND FELONIOUSLY ROB, TAKE, STEAL AND CARRY AWAY FROM THE PRESENCE OF VIRGIE LORETTA CARSON, WHO WAS THEN AND THERE AN EMPLOYEE OF JOHN N. MOREE, A PROPRIETORSHIP, DOING BUSINESS AS "JOHN'S QUICK STOP # 2," CERTAIN PROPERTY WHICH WAS THEN AND THERE IN THE CUSTODY OF SAID VIRGIE LORETTA CARSON, TO WIT: IN EXCESS OF ONE HUNDRED DOLLARS ($100.00), IN GOOD AND LAWFUL MONEY OF THE UNITED STATES OF AMERICA, AGAINST HER WILL, BY THEN AND THERE PUTTING THE SAID VIRGIE LORETTA CARSON IN FEAR OF SOME IMMEDIATE INJURY TO HER PERSON, BY THE EXHIBITION OF A CERTAIN *1047 DEADLY WEAPON TO WIT: A 12 GAUGE SHOTGUN, IN VIOLATION OF SECTION 97-3-79 OF THE MISSISSIPPI CODE OF 1972, AS AMEN.
DONALD RAY ABRAM DID WILLFULLY, UNLAWFULLY, FELONIOUSLY, WITHOUT AUTHORITY OF LAW AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER ONE VIRGIE LORETTA CARSON, A HUMAN BEING, AT THE TIME WHEN HE THE SAID DONALD RAY ABRAM, WAS ENGAGED IN THE COMMISSION OF THE CRIME OF ARMED ROBBERY. IN VIOLATION OF SECTION 97-3-19(2)(e) OF THE MISSISSIPPI CODE OF 1972, AS AMENDED.
DONALD RAY ABRAM DID WILLFULLY, UNLAWFULLY, FELONIOUSLY, WITHOUT AUTHORITY OF LAW AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER ONE PERCY E. QUIN, A HUMAN BEING, AT THE TIME WHEN HE THE SAID DONALD RAY ABRAM, WAS ENGAGED IN THE COMMISSION OF THE CRIME OF ARMED ROBBERY. IN VIOLATION OF SECTION 97-3-19(2)(e) OF THE MISSISSIPPI CODE OF 1972, AS AMENDED.
Under the "totality of the circumstances" test used by this Court and the United States Supreme Court, it is clear beyond doubt that Judge Speights, the issuing magistrate, lacked a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548; Lee v. State, 435 So.2d 674, 677 (Miss. 1983).
Judge Speights had only the "barebones affidavits" to work with. In Illinois v. Gates, the Court made it abundantly clear that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." 462 U.S. at 239, 103 S.Ct. at 2333, 76 L.Ed.2d at 549. Further:
Our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that "he has cause to suspect and does believe" that liquor illegally brought into the United States is located on certain premises will not do. Nathanson v. United States, 290 U S 41, 78 L Ed 159, 54 S Ct 11 (1933). An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusory statement at issue in Nathanson failed to meet this requirement. An officer's statement that "[a]ffiants have received reliable information from a credible person and do believe" that heroin is stored in a home, is likewise inadequate. Aguilar v. Texas, 378 U S 108, 12 L Ed 2d 723, 84 S Ct 1509 (1964). As in Nathanson, this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause.
Just as the affidavits discussed in Gates failed to provide a "substantial basis" for finding probable cause to issue a search warrant, the affidavits presented to Judge Speights likewise failed to provide him with a "substantial basis" for finding that probable cause existed to issue warrants for the arrest of Donald Ray Abram. Speights was not offered any "facts set forth separately in writing in or with the complaint [nor] any supporting affidavits or supplemental sworn testimony" as required. Unif.Crim.R.Cir.Ct.P. 1.01.

B. Neutral and Detached Magistrate
The lack of probable cause is not the only problem I find with regard to the arrest of Abram. He correctly claims on appeal that Judge Speights failed to act as a neutral and detached magistrate.
McCommon v. State, 467 So.2d 940 (Miss. 1985), cert. denied 474 U.S. 984, 106 S.Ct. 393, 88 L.Ed.2d 345 (1985) offers an ample statement of the law:
Both the United States Supreme Court and this Court have held that the individual issuing the warrant must be a neutral and detached magistrate. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Birchfield v. State, 412 So.2d 1181 (Miss. 1982). A *1048 magistrate who fails to perform his neutral and detached function and who serves "merely as a rubber stamp for the police" cannot validly issue [an arrest] warrant. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979).
467 So.2d at 942.
The Court goes on to explain in no uncertain terms the importance of this function. In McCommon, the magistrate testified that he relied more on the fact that the applicants were sworn police officers and less on the affidavits. But he added that he never would have issued the warrants had he thought it inappropriate. Id. The Court felt this testimony was sufficient to defeat the argument that the magistrate was acting "merely as a rubber stamp for the police." Id.
Not surprisingly, both Abram and the State rely on McCommon for their respective arguments. The State points to the single statement of Judge Speights that "I wanted to be sure that probable cause existed before I issued a warrant."
Abram, on the other hand, puts this single statement into context to show that Judge Speights woefully failed to fulfill his legal obligation. Abram also distinguishes McCommon on the basis that in McCommon the affidavit for warrant at least adequately established probable cause, regardless of whether the magistrate performed his function in a neutral and detached manner.
Bearing well in mind the wholly inadequate affidavits presented by Sheriff Forbes, Judge Speights explained that he did nothing more than require the Sheriff to make those same naked allegations under oath, after which he assumed probable cause. It is one thing to take a sworn officer's word when the facts presented already conclusively establish probable cause, but it is quite another to take a sworn officer's word when the facts presented are conclusively deficient on the issue of probable cause.
Judge Speights testified that he wanted to be sure that probable cause existed. But his testimony displays a method which is totally out of line with the requirements of the law. Nothing he did that Thursday morning when Sheriff Forbes presented the affidavits remotely demonstrated an exercise in neutrality and detachment.

C. Admissibility of the Confession
Notwithstanding the illegality of Abram's arrest, further inquiry is required to determine whether Abram's confession, subsequently given in the context of custodial interrogation, is admissible consistent with the Fourth Amendment and Section 23 of the Mississippi Constitution. Lanier v. State teaches that "the threshold issue in deciding admissibility requires a determination of the statement's voluntariness." 450 So.2d at 74; see also, Lanier v. South Carolina, 474 U.S. 25, 106 S.Ct. 297, 88 L.Ed.2d 23 (1985). Consistent with the majority opinion on this point, the threshold cannot be crossed for the reason that Abram's confession cannot be considered voluntary. But to demonstrate yet another reason why this case must be reversed, I am obliged to go further.
Assuming for argument the confession was voluntary, we are compelled to look for the presence of "intervening events" which may be sufficient to "break the causal connection between the illegal arrest and the confession so that the confession is `sufficiently an act of free will to purge the primary taint'." Taylor v. Alabama, 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); Brown v. Illinois, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In other words, we ask whether the confession must be excluded as "fruit of the poisonous tree?" Wong Sun v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Reduced to a list of relevant factors, we consider (1) whether Miranda warnings were given and under what circumstances, (2) the temporal proximity of the arrest and confession, (3) the presence of intervening circumstances, (4) the purpose and flagrancy of the official misconduct, and (5) any other relevant circumstances. Henry v. State, 486 So.2d 1209, 1213 (Miss. 1986); Hall v. State, 427 So.2d 957, 959-60 (Miss. 1983).

*1049 1.
Abram clearly was given the full array of Miranda warnings and arguably waived them either by responding to questioning or in writing such that this factor must weigh in favor of the State.

2.
As for the second factor, Abram's confession on Sunday, August 15, 1982, followed his arrest 3 days earlier on Thursday, August 12, 1982. The State suggests that this period allowed Abram to become acclimated to his surroundings. See Hall v. State, 427 So.2d at 960-61. Abram suggests otherwise.
In Hall, the defendant was held some 60 hours prior to confessing. Given the fact that "Hall was no stranger to the jailhouse environment," the Court held that as a matter of "common sense" Hall had "sufficient time to become acclimated to his surroundings." Id. at 960-61, n. 5; see also Carter v. State, 473 So.2d 471, 476 (Miss. 1985) (admissibility suggested where the temporal proximity was 3 days, the Court holding without explanation that this was sufficient time for Carter to become acclimated to his surroundings).
As to the "temporal proximity" issue, Hall merely reiterated the prevailing suspicion of those confessions which follow shortly after incarceration, recognizing that "the coercive impact of incarceration may dissipate with time." 427 So.2d at 961; see also Henry v. State, 486 So.2d at 1214; Carter v. State, 473 So.2d 471 (Miss. 1985); Dunaway v. New York, 442 U.S. 200, 216-19, 99 S.Ct. 2248, 2258-60, 60 L.Ed.2d 824, 838-840 (1979); Patterson v. State, 413 So.2d 1036, 1039-40 (Miss. 1982); Dycus v. State, 396 So.2d 23, 26-27 (Miss. 1981). But in Henry, the Court recognized the converse  "Just as self-evident is the coercive effect of prolonged incarceration." 486 So.2d at 1214. Henry appropriately characterized the "`temporal proximity factor' [as] a two-edged sword to be employed with caution." Id.
This case presents a man who, at the time of his illegal arrest, was represented by counsel in an unrelated felony prosecution, a fact which may arguably suggest a familiarity with the criminal justice system, if not the custodial environment. Abram had been at liberty via bond on this unrelated charge, and there is absolutely no evidence in the record to suggest that Abram was a repeat customer at the jail-house. He certainly was no Joe Lee Hall, a man who had been arrested "maybe a hundred" times. Hall, 427 So.2d at 961 n. 5. Furthermore, Abram was held virtually incommunicado for three days. He was continuously interrogated by law enforcement officials or their agents, and at one point was removed to Jackson for a lie detector examination.
These facts suggest that the "coercive impact of incarceration [did not] dissipate with time," but instead grew stronger, although this factor in and of itself is not conclusive on the broader question of admissibility.

3.
The State points to the giving of Miranda warnings as a significant intervening event suggestive of admissibility. But this fact is only one consideration, and alone, the presence of warnings is an insignificant event. Bolton v. State, 530 So.2d 1360, 1362 (Miss. 1988); Taylor v. Alabama, 457 U.S. at 691, 102 S.Ct. at 2667, 73 L.Ed.2d at 320 (State's reliance on the giving of Miranda warnings as a significant intervening event held "misplaced"); see also, Dycus v. State, 396 So.2d 23, 27 (Miss. 1981) (giving of Miranda warnings is alone an insignificant event in the causal chain).
The State can point to no other intervening events of any significance, nor can any be found. In Carter v. State, the Court attached great significance to the fact that Carter was given an initial appearance "immediately after his arrest and bond was set," and "two days after his arrest he was taken ... for psychiatric evaluation." Events such as these tend to dissipate the primary taint of an illegal arrest. 473 So.2d at 476. In Bolton, the defendant was allowed to visit at length with his mother, a minister, and the justice court judge.
Obviously, there are no such events of record in this case. The complete absence *1050 of any significant intervening events is a fact suggesting inadmissibility of the confession.

4.
Turning to the "purpose and flagrancy" of the official misconduct in making the illegal arrest, I am hard-pressed to distinguish this case in any significant respect from the Brown-Dunaway-Taylor trilogy. The State argues that Sheriff Forbes showed good faith by waiting some two weeks after he got his initial tip to arrest Abram, and by going through the proper channels to secure arrest warrants. The State also attaches significance to the fact that Abram was lawfully in custody on an unrelated charge, a claim I view as unavailing given the manner in which his custody was secured, i.e., the abrupt raising of his bail from $1,500.00 to $10,000.00 based on unfounded rumor and Judge Speights' prior knowledge that capital murder arrest warrants (not based on probable cause) had been issued for Abram.
Ironically, Sheriff Forbes did not see fit to use those very warrants until after Abram confessed. His purposeful failure to arrest Abram with the very warrants which he allegedly procured in good faith somehow belies the State's argument on appeal that there was no official misconduct. Sheriff Forbes' own testimony reveals a deliberate, purposeful and flagrant scheme to take Abram into custody without his lawyer's knowledge in the hope that a statement could be secured.
It was held by the United States Supreme Court in Brown v. Illinois that:
The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." [record citations omitted] The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.
422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428.
Dunaway v. New York is to like effect  the defendant was held for questioning without being charged or told that he was under arrest as part of an "expedition for evidence." 442 U.S. at 218-19, 99 S.Ct. at 2259-60, 60 L.Ed.2d at 839-40.
Finally, in Taylor v. Alabama, the Court stated:
[W]e fail to see any relevant distinction between the conduct here and that in Dunaway. In this case, as in Dunaway, the police effectuated an investigatory arrest without probable cause, based on an uncorroborated informant's tip, and involuntarily transported petitioner to the station for interrogation in the hope that something would turn up. The fact that the police did not physically abuse petitioner, or that the confession they obtained may have been "voluntary" for purposes of the Fifth Amendment, does not cure the illegality of the initial arrest.
* * * * * *
In sum, petitioner's confession was the fruit of his illegal arrest. Under our decisions in Brown v Illinois and Dunaway v New York, the confession clearly should not have been admitted at his trial.
457 U.S. at 693, 102 S.Ct. at 2668-69, 73 L.Ed.2d at 321.

5.
As for the final Brown factor, I simply refer to the statement of facts. Short of actually finding facts, I can easily conclude from the uncontradicted facts that Abram's confession was not sufficiently an act of free will removed from the illegality of his arrest. Accordingly, the confession should have been ruled inadmissible as fruit of the poisonous tree.
PRATHER and ROBERTSON, JJ., join this dissent.
NOTES
[1] The transcript of Rev. Jones's testimony incorrectly identifies the date of his visit with Abram as August 12. It is generally agreed that he in fact met with Abram on August 14, a Saturday.
[2] Abram was not technically arrested by service of warrants until Sunday, August 15, 1982. However, he was functionally under arrest once he was taken into custody on Thursday, August 12, 1982.
[3] The statute and rule use the phrase "reasonable grounds," but Swanier makes clear that "probable cause" and "reasonable grounds" are synonymous. Federal precedent is to like effect. Draper v. United States, 358 U.S. 307, 310 n. 3, 79 S.Ct. 329, 331 n. 3, 3 L.Ed.2d 327, 330 n. 3 (1959).
[4] We proceed under state law since it "provides an adequate and equal basis for these constitutional rights," and "compels the result," using authoritative federal decisions only for guidance. Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984).
[5] This section was amended effective July 1, 1991, but no substantive change was made; only grammatical changes were made. We thus may analyze this claim under the amended version of the statute even though not in effect at the time the appeal was perfected.
[6] In its entirety, section 99-19-101(7) reads: "In order to return or impose a sentence of death the jury must make a written finding of one or more of the following:

(a) The defendant actually killed;
(b) The defendant attempted to kill;
(c) The defendant intended that a killing take place;
(d) The defendant contemplated that lethal force would be employed.