883 So.2d 98 (2004)
Phillip W. BOUGON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2002-KA-00868-COA.
Court of Appeals of Mississippi.
March 9, 2004.
Rehearing Denied June 15, 2004.
Certiorari Denied October 7, 2004.
*101 James W. Kitchens, Margaret P. Ellis, Pascagoula, Jeffrey Lynn Ellis, attorneys for appellant.
Office of the Attorney General by Charles W. Maris, Jr., attorney for appellee.
Before McMILLIN, C.J., IRVING and MYERS, JJ.
IRVING, J., for the Court.
¶ 1. A Neshoba County jury convicted Phillip W. Bougon of manslaughter by culpable negligence. The trial court sentenced him to twenty years in the custody of the Mississippi Department of Corrections with one year suspended and one year on post-release supervision. Bougon appeals and alleges prejudicial error occurred in the trial court's (1) admission of certain evidence regarding flight and in the court's refusal to admit other evidence to explain or rebut the evidence of flight, (2) grant of certain jury instructions and in the modification of others, (3) denial of various motions for a mistrial, and (4) refusal to suppress certain verbal statements. Bougon also alleges that the cumulative effect of the errors operated to deny him a fair trial.
¶ 2. We find no reversible error; therefore, we affirm the trial court on all issues.

FACTS
¶ 3. On Monday morning, March 19, 2001, Shannon McNeil went turkey hunting after leaving work. When he did not return home later in the evening, the sheriff's department began searching for him around 8:30 p.m. His body was found by a volunteer fireman around 11:30 p.m. in a nearby shallow creek. He had died of a shotgun blast to the head and neck. Authorities immediately began collecting evidence at the scene of the crime. They found a spent shotgun shell forty-four feet from where McNeil's body was found. Tree limb fragments, which had been clipped by gun pellets, made a trail from where the spent shell was found to the place where McNeil's body was found.
¶ 4. The next morning, investigators began questioning people living in the area, including Bougon, to determine if anyone had information about the killing. Bougon was questioned again later that day. On Wednesday, the investigators returned a third time to question Bougon, but he was away in Leake County working. Bougon's live-in girlfriend, Vicki Vance, gave the investigators permission to examine Bougon's rifle and shotgun, and they obtained the serial numbers from both guns. Vance testified that she became concerned about the investigators' actions and summoned Bougon's friend, Ronnie Hancock, to take her to Bougon's job. When they arrived at his work place, Vance informed Bougon of the investigators' actions and requested that he come home. Further, Hancock told Bougon that "they think you did it."
¶ 5. When Vance and Hancock returned to Neshoba County later that day, Hancock was arrested in Bougon's driveway. Vance phoned Bougon while he was still at work and informed him of Hancock's arrest. She also advised him that if he did not come in and answer questions, the authorities would charge Hancock with *102 manslaughter. After talking with Vance, Bougon decided not to come home that night. However, investigators came back to his house looking for him and confiscated his guns. The guns were later tested and it was determined that the spent shotgun shell found at the scene of the crime was fired from Bougon's shotgun. The sheriff continued to look for Bougon, and finally found and arrested him on Thursday night. Additional facts will be related during our discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

(1) Evidence of Flight and the Appropriateness of a Flight Instruction
¶ 6. It is well-settled law that the admission of evidence is within the discretion of the trial judge, and his decision is reversible only when there has been an abuse of discretion which results in prejudice to the accused. Miller v. State, 801 So.2d 799, 803(¶ 18) (Miss.Ct.App.2001). Further, our supreme court has consistently held that flight is admissible as evidence of consciousness of guilt. Fuselier v. State, 702 So.2d 388, 390(¶ 4) (Miss.1997). However, a flight instruction is appropriate only where the flight is unexplained and somehow probative of guilt or guilty knowledge. Id. Therefore, evidence of flight is inadmissable where there is an independent reason for the flight. Id.
¶ 7. The State offered evidence tending to show that Bougon attempted to avoid law enforcement authorities on the morning following Hancock's arrest. The State also offered evidence concerning the circumstances surrounding Bougon's arrest. This evidence revealed that Bougon was captured at a neighbor's house in a closet hiding under a blanket.
¶ 8. Bougon directs our attention to Fuselier. In Fuselier, Eric Fuselier was initially convicted of murder, but his conviction was overturned on appeal because the trial court erroneously granted an instruction on flight. Fuselier, 702 So.2d at 389, 391 (¶¶ 2, 9). On remand, Fuselier entered a plea of guilty to capital murder and burglary. Id. at 389(¶ 2). However, his conviction and sentence pursuant to the guilty plea were overturned in a second appeal on grounds not relevant to our issue. Id. at 390(¶ 2). On remand from the second appeal, the State again adduced evidence of Fuselier's flight but did not seek an instruction on flight. Id. at 390(¶ 6). Again, our supreme court reversed, holding that, notwithstanding the fact that a flight instruction was not given, admission of evidence of Fuselier's flight was reversible error. Id. at 394(¶ 20). In Fuselier's first appeal, the court, in reversing Fuselier's conviction because of the improper flight instruction, had observed that the trial court was aware of an explanation, which was inadmissible, for Fuselier's flight and that Fuselier was "obviously put in a no-win situation by either being required to explain his flight and the fact that he was a prison escapee, or not explaining the flight and subjecting himself to a flight instruction." Id. at 390(¶ 5).
¶ 9. Here, Bougon, while not conceding that his actions constituted flight, argues that the trial court erred in admitting evidence of his alleged flight and in instructing the jury on the law regarding flight.[1] He attacks the trial court's ruling *103 on two fronts. First, he alleges that he did not go home, after being informed that the authorities were waiting on him to come back, because he was trying to help Hancock by establishing Hancock's whereabouts on the day McNeil was killed. In support of this assertion, he gives a detailed account as to what he did to help Hancock. He states that on Thursday, the third day following the discovery of McNeil's body, he spent about six hours making phone calls, driving around, and visiting different people in an effort to establish where Hancock had been at the time of McNeil's death.
¶ 10. Second, he contends that he had another reasonable explanation, unrelated to any involvement in McNeil's murder, for not returning home even though he knew that the authorities were looking for him. He argues that since he had been convicted of armed robbery ten years earlier, he feared being arrested for possession of a firearm by a convicted felon. Therefore, he asserts that he had a reason independent of McNeil's death for attempting to avoid capture. He claims that if he had offered this explanation at trial, it would have severely prejudiced his defense.
¶ 11. As to Bougon's first contention, we are not persuaded that his efforts to assist his friend dictated that he stay away from home and that this was a sufficient reason not to be viewed as fleeing from the authorities. This is particularly true in light of his comment to Vance  after he had been informed by her of Hancock's arrest  that he was not "coming into the same thing that Ronnie [Hancock] had just walked into." As already noted, Hancock had been arrested in connection with McNeil's murder. We can perceive no reason why Bougon could not have returned home on Wednesday and consulted with authorities even if he wanted to spend some time investigating Hancock's whereabouts on the day McNeil was killed. Surely, he must have known that the consultation was not likely to last indefinitely and that he still would have time to do the investigative work for his friend, unless he knew that he had some involvement with McNeil's death and that, in all likelihood, he would be arrested if he returned.
¶ 12. Bougon's second contention is somewhat puzzling. As noted, he claims that he had fears of being arrested because he, as a convicted felon, was illegally in possession of firearms, yet he claims he had a permit from Judge Marcus Gordon to carry a firearm. Bougon testified that Judge Marcus Gordon had given him the right to carry a firearm but that the papers authorizing him to carry a firearm were lost when his house burned in 1997, and that he did not attempt to get another copy or get another order signed.
¶ 13. We find it patently inconsistent for Bougon to contend on the one hand that he possessed legal permission to carry a firearm but contend on the other that he feared being arrested for possession of firearms. Even if he no longer had the order as he contended, it appears to us that he would not have feared being arrested for illegal possession of the guns because there would not have been any reason to believe that he could not prove that he had permission since the judge *104 who allegedly granted the permission could have verified that fact. We are aware of Bougon's attorney's statement that a record of the order could not be found in Scott County where it was allegedly signed nor in Lincoln County where Bougon was convicted of the armed robbery. Nevertheless, the significant point is not that no order existed or could be found, but that Bougon was of the mind-set that he had permission to carry a firearm. With such a mind-set, there would not have been any reason to fear being charged with illegal possession of a firearm.
¶ 14. We reject, as did the trial court, the independent explanations of innocence offered by Bougon for his furtive movements after he was advised that he was a suspect in McNeil's disappearance. We also find that, although Bougon had a legitimate reason for leaving home on the Wednesday following the discovery of McNeil's body (he went to work), his decision not to return home after being told that the authorities "thought he did it" and wanted to further interrogate him was the equivalent of flight. This conclusion is supported by the fact that Bougon was ultimately found at a neighbor's house in a closet under a blanket. Therefore, we affirm the decision of the trial court to grant a flight instruction. This issue lacks merit.

(2) Vicki Vance's Testimony
¶ 15. Bougon next contends that the trial court erred in preventing him from rebutting the State's claim of flight by not allowing Vance to testify as to what he told her during the telephone conversation in which she informed him that Hancock had been arrested. The jury was not allowed to hear the following testimony from Vance which was offered during a proffer:
A: I told him [Bougon] that Ronnie was  that they had Ronnie. And that I was told that they were going to charge him with manslaughter if Phillip [Bougon] didn't come home.
Q: What, if any, plan did Phillip Bougon relate to you after you told him that?
A: He had to help Ronnie. He had to help Ronnie.
Q: Did he elaborate and say how?
A: He had to find somebody that he was with.
Q: At the time Mr. McNeil was shot?
A: Yes sir.
¶ 16. Bougon argues that the testimonial evidence quoted above was admissible to explain why he acted as he did and to show his plans or intent. He maintains that by prohibiting Vance from testifying to his actions on Thursday, March 22, the trial court effectively left the jury with the impression that he was evading authorities.
¶ 17. The State points out that Vance was prohibited only from giving hearsay testimony and that Bougon was allowed to testify to substantially everything to which Vance was prohibited. The State also points us to the following testimony given by Bougon during direct examination:
Q: Mr. Bougon, as a result of the phone call late Wednesday from Vickie Vance, what if anything, did you undertake to do for Ronnie Hancock?
A: To help him out any way I could to find out where he was that Monday morning.
Q: What do you mean by that, sir?
A: I had some people I could go see that were mutual friends. And just to find out if Ronnie had been there any time that day.
¶ 18. Bougon argues that Vance's testimony was admissible under Rule 803 of the Mississippi Rules of Evidence. Rule *105 803(3) allows the admission of a statement that would otherwise be excluded as hearsay, when it is "a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." M.R.E. 803(3). The comments to Rule 803 state that statements which indicate an intention to do something in the future are admissible to prove that the act intended took place.
¶ 19. The admission of evidence is left to the sound discretion of the trial judge. Parker v. State, 606 So.2d 1132, 1137 (Miss.1992). "However, that discretion must still be exercised within the scope of the Mississippi Rules of Evidence, and a reversal will result only when an abuse of discretion results in prejudice to the accused." Id. at 1138.
¶ 20. As to the admission of Vance's testimony under Rule 803, the State, citing Simmons v. State, 805 So.2d 452, 488-89 (Miss.2001), responds that the testimony was not admissible under the stated rule because the testimony consisted of self-serving declarations by Bougon. We need not decide whether the trial court abused its discretion in refusing to allow Vance to testify concerning what Bougon said to her when she informed him that Hancock had been arrested. We agree with the State that, since Bougon himself testified to basically the same things that Vance would have testified to, the jury was allowed to hear his alleged reasons for not coming home on Wednesday night. Consequently, we find that even if the trial court erred in not allowing Vance's testimony, such error was indeed harmless.

(3) Statements Made by Prosecution Witness
¶ 21. Bougon asserts that the trial court erred in overruling his motion for a mistrial based on alleged improper statements made by prosecution witness Jamie Bozeman. While on the stand, Bozeman, who alleged that he heard Bougon admit to the shooting, engaged in the following exchange with Bougon's defense counsel:
Q: So, did Phillip ever talk to Adrian Bell[2] in your presence about the case?
A: No, sir. They just worked out a lot. And they would talk about it every now and then about just, you know, he is hoping he will get out. That he had done served enough time for a convicted armed felon.
Defense counsel immediately asked for a bench conference and conducted a voir dire of Bozeman outside the presence of the jury. Bozeman stated that no one from the district attorney's office had informed him that he could not mention Bougon's previous conviction. The defense counsel then moved for a mistrial asserting irrevocable prejudice to the defendant, but the trial court denied the motion. The court did however instruct the jury that the statement made by Bozeman was improper and that it should not be considered by them as they continued to hear the evidence and consider the case. The court further polled the jurors individually, and each agreed that he or she could set the remark aside and continue to hear the evidence without considering the remark.
¶ 22. The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. *106 Weeks v. State, 804 So.2d 980, 992(¶ 37) (Miss.2001). The trial judge is provided considerable discretion in determining whether a remark is so prejudicial that a mistrial should be declared. Id. However, if serious and irreparable damage has not occurred, then the trial judge should direct the jury to disregard the remark. Id. The failure of the court to grant a motion for mistrial will not be overturned on appeal unless the trial court abused its discretion. Bass v. State, 597 So.2d 182, 191 (Miss.1992).
¶ 23. In the present case, we find that the trial judge did not abuse his discretion in denying Bougon's request for a mistrial. The judge admonished the jury and polled them individually; therefore, he took appropriate measures to cure any potential prejudicial effect of the remark. For the forgoing reasons, this issue lacks merit.

(4) Initial Appearance
¶ 24. Bougon argues that the State's failure to provide him with an initial appearance within forty-eight hours of his arrest resulted in statements which were later used against him at trial. He further asserts that the failure to provide an initial appearance violated his constitutional rights and resulted in prejudice to him at trial when the statements were introduced.
¶ 25. Rule 6.03 of the Uniform Rules of Circuit and County Court requires that every person in custody be taken, without unnecessary delay and within forty-eight hours of arrest, before a judicial officer or other person authorized by statute for an initial appearance. URCCC 6.03. However, a violation of Rule 6.03 alone will not result in the suppression of evidence or reversible error where the defendant was informed of his rights and made a knowing and voluntary waiver. Jones v. State, 841 So.2d 115, 132(¶ 47) (Miss.2003). Thus, the failure to provide an initial appearance for an accused within the time provided is not in and of itself a reason to suppress a confession. Id.
¶ 26. Bougon was arrested on March 22 and was not taken before a judge for an initial appearance until March 26. He was read his rights immediately after being arrested. On Sunday, March 25, he again was administered his rights and he signed a waiver and gave what may be termed an oral confession.
¶ 27. Bougon cites Abram v. State, 606 So.2d 1015 (Miss.1992) in support of his argument that since he was not afforded an initial appearance within forty-eight hours, his oral statements should have been suppressed. In Abram, the defendant was not brought for an initial appearance until seventy-two hours after his arrest. Our supreme court found that the "the failure to provide the initial appearance reversible since, as a consequence, Abram gave a confession in the absence of, and in violation of, his right to counsel." Id. at 1029. The court went on to hold that the error could not be harmless in light of the fact that Abram's capital murder conviction was based entirely on his confession. Id. The court further observed that the failure to provide Abram with a timely initial appearance had devastating consequences for the defense and that law enforcement authorities would never have obtained an uncounseled confession from Abram had he been given an initial appearance and access to counsel without unnecessary delay. Id.
¶ 28. This case is easily distinguishable. The State correctly points out that in Abram, the confession in question was found to be coerced and the confession was the only evidence tying Abram to the crimes. In the case-at-bar, nothing in the *107 record suggests there was any type of coercion. Bougon freely and voluntarily waived his rights under Miranda and freely gave a statement. Unlike, in Abram, here, the law enforcement authorities did not subject Bougon, following his arrest, to immediate and constant interrogation until they obtained a confession. Therefore, we affirm the trial judge's ruling.

(5) Court's Comments to the Jury
¶ 29. Bougon alleges that the trial court erred in denying his motion for a mistrial based on a comment made by the court to the jury. He claims that the judge's remark left the jury with the impression that the court would not allow a mistrial and that the jury would be forced to deliberate until they reached a verdict.
¶ 30. The jury began deliberations around 10:50 a.m. after more than seven days of trial. Around 3:50 p.m. on the first day of deliberation, the jury signaled it could not reach a unanimous decision, being split seven for manslaughter and five for not guilty. The jury was told to continue to deliberate. At approximately 8:55 p.m., the jury again indicated that it had been unable to reach a unanimous verdict, being split eight for manslaughter and four for not guilty. The spokesperson for the jury stated that she did not think that further deliberations would be helpful. The court dismissed the jury for the night with instructions to return for further deliberations at 9:00 a.m. the next day.
¶ 31. On the following morning the court gave the Sharplin charge[3] and instructed the jury to continue deliberations in order to try and reach a unanimous verdict. At approximately 11:58 a.m., the jury was brought into the courtroom, and the court inquired if the jury was still divided along the same numerical lines and if the jury thought further deliberations would be helpful. The spokesperson advised that the division remained the same but that she thought further deliberations would be helpful. The court then returned the jury to the jury room for further deliberations. At approximately 2:15 p.m., the jury sent a note that it was "hung, ten guilty, two not guilty." The trial judge had the jury returned to the jury box, and the record reflects that the following transpired:
THE COURT: And I have had a communication from you which would indicate just on the face of what you have told the Court  what the jury has told the Court, there has been some movement.
JUROR KATHY LAND: Yes, sir.
THE COURT: My question would be whether, based on that, do you feel that further deliberation would tend to enable the jury to reach a verdict?
JUROR KATHY LAND: No, sir, I do not.
THE COURT: I'm going to let you all return to the jury room and continue deliberation.
JUROR KATHY LAND: Yes, sir.
THE COURT: Be retired.
WHEREUPON, AT 2:22 P.M., THE JURY WAS RETIRED TO THE JURY ROOM, AND THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE OF THE JURY:
THE COURT: Court will be in recess to await the verdict of the jury.[4]
*108 ¶ 32. At 4:00 p.m., the jury was returned to the jury box, and the court inquired if the numerical split had changed. The spokesperson responded that it had not but that the jury felt that further deliberation would enable it to return a unanimous verdict. The trial jury was returned to the jury room for further deliberations and, at 4:20 p.m., reported that it had reached a unanimous verdict of guilty.
¶ 33. Following the court's inquiry of the jury which occurred at 2:15 p.m., Bougon made a motion for a mistrial, alleging that the comment, which was allegedly made in the presence of the jury, was improper because "the judge's statement seemed to have the effect of eliminating the option of the jury to return a hung verdict." The judge denied Bougon's motion, reasoning that his statement was not so prejudicial as to rise to the level of mistrial.
¶ 34. We agree with the judge that his remarks were not prejudicial to Bougon. The judge simply stated that the court would be in recess until a verdict was returned, and a review of the statement in the context in which it was made reveals that one could not reasonably interpret it to mean that a mistrial or hung verdict was not an option. In fact, the jury reported approximately an hour and a half after the comment was made that it was still divided along the same numerical split as it had been before the comment was made. Surely, if the jury had understood or believed that the court was directing it to go out and return a verdict of guilty, it would not have taken two hours to do so. For the forgoing reasons, we find that the judge did not abuse his discretion in denying Bougon's motion for a mistrial; therefore, we affirm the judge's denial of the motion for a mistrial.

(6) Remarks of Prosecutor
¶ 35. During the defense's cross examination of State's witness, Eric Fulton, the prosecutor made the following objection:
Your Honor  excuse me. If it please the court, I have been waiting to make this objection trying to decide what appropriate time. But, if the defense of the defendant is alibi 
Bougon's defense attorney immediately objected and moved for a mistrial. The trial judge ruled that the comment was not fatal and denied the motion. Bougon contends that the trial court erred in denying his motion because the comment impermissibly conveyed to the jury that he was obligated to put on a defense in his behalf and would be forced to testify.
¶ 36. The State correctly notes that, on issues of comments concerning a defendant's failure to testify, each case shall be considered on an individual basis. Weeks, 804 So.2d at 993(¶ 43). Further, the intention of the prosecutor is immaterial; the test is whether the language can be reasonably construed to be a comment upon the failure of the defendant to take the stand. Id.
¶ 37. We find no abuse of discretion here. The judge was well within his discretion in denying Bougon's motion for mistrial. Nothing in the record suggests that the statement in issue directly or indirectly referred to Bougon's right to testify or take the stand, and the statement cannot be construed reasonably to mean what Bougon alleges. Further, our review of the record indicates that the notion of an alibi was first introduced by the defense and not the State. In his opening statements, Bougon's attorney argued *109 that "And I'm going to tell you that through that date  through that day of the 19th there was about an hour or two that morning when he was alone. The rest of the time there was somebody with him and thus the defense has an alibi." As the State points out, since this information regarding Bougon's defense had already been placed before the jury during opening statements, he cannot claim prejudice. Additionally, Bougon did in fact take the stand and testify in his own defense. This issue lacks merit.

(7) Court's Comment
¶ 38. During the State's redirect of its witness, Calvin Fulton, the following exchange occurred:
Q: And apparently he had the net on when he was shot?
A. Apparently so.
DEFENSE ATTORNEY: Object to leading and speculation, your honor.
THE COURT: All right. I'm going to overrule the objection with this comment. It may be early akin to leading. But, in light of the broad cross-examination on the issue of hunter safety and in the interest of time, I think it's proper to allow Mr. Turner to get to the particular points about refuting what you sought to develop. So objection is overruled. Go ahead.
The defense then moved for a mistrial on the basis that the court had strongly suggested to the jury that the defense's cross-examination of the witness was unusual in that it was more thorough and broader than an ordinary cross-examination. Defense counsel further argued that "the implication of that to this jury is that he [attorney for the State] can refute things that I developed on cross-examination of this witness, and that the court expects him to refute things which were brought out on cross-examination." Defense counsel now maintains that this was an improper comment on the evidence.
¶ 39. The court denied Bougon's motion, stating that "it was not the intent of the court to infer anything to the jury that the court was leaning a particular way. It was simply just to in the interest of time alert the parties that I was going to allow the State reasonable latitude as far as its redirect." The court further stated that the remark was not intended to be prejudicial and then offered to admonish the jury. Bougon, however, never requested that the court warn the jury about the comment.
¶ 40. The State properly advances that trial judges may explain their rulings on evidentiary objections so long as they do not comment upon the evidence in a prejudicial manner. Wells v. State, 698 So.2d 497, 510 (Miss.1997).
¶ 41. We find that the judge did not err in denying Bougon's motion for a mistrial. We further find that his statement was not an improper comment on the evidence nor an attempt to influence the jury's verdict.

(8) Jury Instruction
¶ 42. Bougon submitted a lengthy jury instruction outlining the various degrees of culpable negligence, and the court amended the instruction before giving it to the jury. As a result, Bougon now asserts that because the jury was not instructed on the theories and degrees of negligence, his right to a fair trial and just verdict was denied. He maintains that the trial court failed to insure that the jury was fully and properly instructed. He alleges that since the jury was left to speculate as to what actions constituted culpable negligence, his conviction must be overturned.
¶ 43. When determining whether error lies in the granting or refusal of various instructions, we must consider *110 all the instructions given as a whole. Simmons v. State, 805 So.2d 452, 476(¶ 37) (Miss.2001). "When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." Id.
¶ 44. Bougon directs this Court to Edwards v. State, 755 So.2d 443 (Miss.Ct.App.1999). In Edwards, a child drowned while on a camping trip with his family. Id. at 445(¶ 2). The parents were indicted for culpable negligence manslaughter. Id. at 445(¶ 3). This Court found that the failure of the State to specify, in the jury instructions, what actions or inactions by the defendants constituted criminal negligence on their part left the jury to "the wildest field of speculation." Id. at 447(13). We concluded that the instructions were so defective as to deny the defendants a fundamentally fair trial. Id. We reversed and rendered, but we did so because of the insufficiency of the evidence rather than the defective jury instructions. Id. at 448(20). We did, however, conclude that the deficient jury instructions would require reversal. Id. at 447(¶ 15).
¶ 45. In the present case, unlike in Edwards, it is apparent from the record that there was abundant evidence presented during the trial to support Bougon's conviction. Further, we find that the amended version of jury instruction D-22 sets forth a correct statement of the law, and it properly instructed the jury, in a concise manner, regarding the various degrees of negligence. The amended version of the instruction is substantially similar to the original version and is less confusing. For the forgoing reasons, this issue is without merit.

(9) Cumulative Effect of Errors
¶ 46. Bougon finally contends that the cumulative effect of errors at his trial denied him a fair trial. He maintains that these errors were not harmless and have resulted in prejudice to him.
¶ 47. Individual errors, not reversible in themselves, may combine with other errors to make up reversible error. Weeks, 804 So.2d at 998(¶ 70), citing Wilburn v. State, 608 So.2d 702, 705 (Miss.1992). However, if there are no reversible individual errors, it stands to reason that there can be no cumulative error. After a thorough review of the record, we have found no reversible error as to each individual issue. Therefore, it follows that we find no cumulative reversible error. We are satisfied that Bougon was afforded a fundamentally fair and impartial trial even though it may not have been a perfect trial. However, a perfect trial is not constitutionally required, as such would be almost impossible to obtain.
¶ 48. THE JUDGMENT OF THE CIRCUIT COURT OF NESHOBA COUNTY OF CONVICTION OF CULPABLE MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH ONE YEAR SUSPENDED AND ONE YEAR OF POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NESHOBA COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.
NOTES
[1] The trial court gave the following instruction on flight:

The Court instructs the Jury that "flight" is the evading of the course of justice by voluntarily withdrawing one's self in order to avoid arrest, detention, or the institution or continuance of criminal proceedings, regardless of whether one leaves the jurisdiction.
Flight is a circumstance from which guilty knowledge and fear may be inferred. If you find from the evidence in this case beyond a reasonable doubt that the Defendant Phillip W. Bougon did flee or go into hiding, such flight or hiding of Phillip W. Bougon is to be considered in connection with all other evidence in this case. You will determine from all of the facts whether the flight was from a conscious sense of guilt or whether it was caused by other things, and give it such weight as you think it is entitled to in determining the guilt or innocence of Phillip W. Bougon.
[2] Bell was an inmate in the Neshoba County jail at the same time as was Bougon and Bozeman.
[3] See Sharplin v. State, 330 So.2d 591, 596 (Miss.1976) for the text of the instruction.
[4] Bougon states in his appellate brief that this statement was made in the presence of the jury, that the court reporter made the correction but that for some unexplained reason, the correction was not included in the appellate record. The State makes no contention that this is not an accurate statement of what actually transpired; therefore, we accept the accuracy of the representation.