KING, C.J.,
for the Court.
¶ 1. On October 28, 2003, Michael Johnson was convicted of capital murder in the Rankin County Circuit Court, and was sentenced to a term of life without parole, in the custody of the Mississippi Department of Corrections. Aggrieved by his conviction, he appeals this decision on the following grounds:
I. The trial court committed reversible error in permitting the jury to see the photographs marked S-12, 14 and 15.
II. The trial court committed error by allowing the State to submit a flight instruction to the jury.
III. The verdict was against the overwhelming weight of the evidence.
Finding no error, we affirm.
FACTS
¶ 2. About January 5, 2002, Jay Staple-ton was found beaten to death at his home in Rankin County. According to the Medical Examiner, Stapleton died from blunt force trauma to the head. The beating was done with a hammer. Michael Johnson was convicted of this crime.
¶ 3. After leaving work on January 4, 2002, Johnson, his girlfriend, her sister and children traveled to Belzoni, Mississippi. Mr. Johnson and his girlfriend returned to Rankin County, where he dropped her off at their home in Puckett. Then Johnson visited his landlord to get his rental security deposit of one hundred dollars. Johnson next picked up Jeff Buchanan and the two traveled to several other locations to obtain money, with which to purchase crack cocaine. Ray Cameron, a drug dealer, who lived in Simpson County, testified that Johnson purchased crack cocaine from him on four separate occasions throughout the night of January 4, 2002. Cameron also testified that he observed blood on Johnson that night. Johnson explained to Cameron that he had killed and skinned a deer, and in the process had gotten blood on himself.
¶ 4. Johnson returned home the following morning at approximately 5:00 a.m. *1067 When he entered the bedroom, his girlfriend, Leterica observed that he was very-upset. The two talked for awhile, after which Johnson suggested that they go to her grandmother’s home. They arrived at the grandmother’s home, but she had visitors. Later the grandmother came to their home, and informed them that Mr. Stapleton, the boyfriend of Leterica’s mother, Earnestine, was found dead at his home.
¶ 5. After learning of Stapleton’s death, Johnson, along with Leterica, her mother, and grandmother, traveled to Stapleton’s home. While there, a deputy sheriff asked them to come to the sheriffs department to make statements.
¶ 6. In his statement, Johnson claimed to have been with his girlfriend on the night Stapleton was killed. After being informed that his statement was inconsistent with that of his girlfriend, Johnson stated that he was not with her that night, but was out smoking crack cocaine. After leaving the sheriffs department, Leterica went to her mother’s home and Johnson returned to the home that he and Leterica shared. The following day, Leterica returned home and discovered that Johnson had taken his belongings and gone to Bel-zoni. A Rankin County deputy sheriff traveled to Belzoni for a further interview with Johnson. After obtaining consent, a search of Johnson’s vehicle was conducted at the Humphrey County Sheriffs Department. During the search, blood was discovered on the dashboard, and Johnson was arrested, and charged with the murder of Eric Stapleton.
ISSUES AND ANALYSIS ISSUE I.
ADMISSIBILITY OF PHOTOGRAPHS
¶ 7. Johnson asks this Court to hold that the trial court committed error by allowing into evidence three photographs of the decedent. He contends that the photographs were of such a gruesome nature as to inflame the jury. Our supreme court has held that where photographs assist and aid in the presentation of a case, they may be admitted into evidence, regardless of their gruesome nature. “Further, photographs have eviden-tiary value when they: 1) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and the cause of death; and 3) where they supplement or clarify witness testimony.” Martin v. State, 854 So.2d 1004, 1008(¶ 7) (Miss.2003). The admissibility of this evidence, just as with any other evidence, rests within the sound discretion of the trial judge, who must determine whether its probative value is outweighed by its prejudicial nature. Id. There is no question that the photographs were very gruesome. However, after a careful weighing of the probative value versus the prejudicial effect of the photographs, the trial court found them to be admissible. The photographs were found to be of assistance in (1) demonstrating the nature of the injury, (2) demonstrating the severity of the attack, (3) indicating the nature of the instrument which inflicted the injury, and (4) identifying the location where the injury occurred. Id.
¶ 8. The trial court was in the best situation to judge the value of evidence. The Court’s decision to admit the photographs was not an abuse of discretion.
ISSUE II.
FLIGHT INSTRUCTION
¶ 9. Johnson contends that the flight instruction should not have been giv *1068 en to the jury. Our supreme court has consistently held that flight is admissible as evidence of consciousness of guilt. Fuselier v. State, 702 So.2d 388, 390 (¶ 14) (Miss.1997). However, a flight instruction is appropriate only where the flight is unexplained and somehow probative of guilt or guilty knowledge. Id. Therefore, evidence of flight is inadmissable where there is an independent reason for the flight. Bougon v. State, 883 So.2d 98, 102(¶ 6) (Miss.Ct.App.2004).
 ¶ 10. The issue of flight was not raised until the court inquired into instructions. At that time, even the court expressed surprise that a flight instruction was requested. It was the trial court’s recollection that Leterica had testified that she and Johnson had an argument following which, he apparently left for Belzoni. It was the State’s position that the evidence was in conflict as to why Johnson went to Belzoni, and therefore the flight instruction should be given. While the evidence of flight is rather weak, there is likewise no clear explanation for Johnson’s travel to Belzoni. It may be inferred from Leteriea’s testimony that Johnson left and went to Belzoni as a result of the argument between the two. However, it may also be inferred from the testimony that Johnson went to Belzoni to flee from the authorities. Where the facts are subject to varied interpretations, a question of fact is raised to be resolved by the jury. Wetz v. State, 503 So.2d 803, 812 (Miss.1987). Under those circumstances, each party is entitled to an instruction, which is consistent with his interpretation of the facts. Wal-Mart Stores, Inc. v. Johnson, 807 So.2d 382, 390 (¶ 20)(Miss.2001)(quoting Murphy v. Burney, 27 So.2d 773, 774 (Miss.1946).
¶ 11. This Court finds no error in giving the flight instruction.
ISSUE III.
OVERWHELMING WEIGHT OF EVIDENCE
¶ 12. Finally, Johnson argues that the verdict was against the overwhelming weight of the evidence. He contends that even taken in the best light, the evidence was insufficient to support a verdict of guilty. In determining whether a verdict was against the overwhelming weight of the evidence, we apply the following standard:
“[tjhis Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal. As such, if the verdict is against the overwhelming weight of the evidence, then a new trial is proper.”
Baker v. State, 802 So.2d 77, 81 (¶ 14) (Miss.2001).
¶ 13. In its consideration of the evidence, the jury had the benefit of testimony by several witnesses, including experts on DNA and a pathologist. According to the evidence, on the evening of January 4, 2002, Johnson had taken Leterica, her sister and children to Belzoni. During their drive, a conversation regarding the victim, Jay Stapleton, transpired. Leterica’s sister, Robbie, stated that Stapleton had just cashed his check and had money. She noted that Stapleton had given money to Earnestine and her and bought a baby doll for her child.
¶ 14. Later that night, Johnson, who used crack cocaine, undertook several measures to obtain money for the purchase of crack cocaine. Included among *1069 them: (1) Johnson went by himself to the landlord’s home to obtain the return of a $100 deposit; (2) Johnson and Jeffrey traveled to the home of Johnson’s co-worker, Sonny, where Johnson attempted to sell a heater. Upon discovering that Sonny did not have his asking price, Johnson accepted $25 from Sonny as a deposit; (3) Later that night, Johnson traveled to his employer’s home, where he borrowed $46 from the employer; (4) Johnson returned to Cameron’s home for a fourth time to purchase crack cocaine. However, this time Cameron refused to accept money from Johnson because it had blood on it. However, Cameron agreed to accept as payment the heater, which Johnson had agreed to sell Sonny. Upon going to Johnson’s car to examine the heater, Cameron saw a hammer on top of the heater. Cameron stated that Johnson had blood on him. When Cameron asked about the hammer and the cut on Johnson’s hand, Johnson replied that he was skinning a deer and had cut himself while cutting the meat off of the deer.
¶ 15. At the end of the night, Johnson returned home to Leterica and, according to her, he was very upset. After hearing of Stapleton’s death, Johnson, Leteri-ea, Earnestine and the grandmother arrived at the scene and later submitted to questioning at the sheriffs department. During Johnson’s interview he provided inconsistent statements regarding his whereabouts for the night. After the interview at the sheriffs office, Johnson returned home and later departed to Belzoni. During a consensual search of Johnson’s vehicle, the officers discovered blood on the dashboard. According to the testimony of an expert witness, the DNA belonged to the victim and was not an old sample. At this time the sheriffs department arrested Johnson and charged him with Stapleton’s murder.
¶ 16. While in detention, Johnson reportedly made a confession to his cell mate, Eric Stapleton. According to Eric Stapleton, Johnson confessed to the murder. Eric Stapleton testified that Johnson told him, he had killed someone with a hammer and the police had nothing on him.
¶ 17. Where the evidence is in conflict, it is well-settled law in Mississippi that matters regarding the weight and credibility accorded the evidence are to be resolved by the jury. See Pearson v. State, 428 So.2d 1361, 1363 (Miss.1983); Gathright v. State, 380 So.2d 1276, 1278 (Miss.1980). “[T]he jury is the sole judge of the credibility of witnesses, and the jury’s decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict.” Lloyd v. State, 755 So.2d 12, 15(¶ 11) (Miss.Ct.App.1999).
¶ 18. The record contains substantial evidence from which the jury could, and did, find Johnson guilty. This Court finds no error in this issue.
¶ 19. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., concur.